Peter DURO, Appellee,

v.

DISTRICT ATTORNEY, SECOND JUDICIAL DISTRICT OF NORTH CAROLINA, Appellant,

North Carolina School Boards Association, Amicus Curiae.

No. 82–1806.

United States Court of Appeals, Fourth Circuit.

Argued March 8, 1983.

Decided July 14, 1983.

Andrew A. Vanore, Jr., Raleigh, N.C. (Edwin M. Speas, Jr., Sp. Deputy Atty. Gen., Raleigh, N.C., on brief), for appellant.

George Daly, Charlotte, N.C. (Charles E. Craze, Gibbs & Craze, Cleveland, Ohio, Wendell Hutchins, Hutchins, Cockrell & Newmann, Plymouth, N.C., on brief), for appellee.

George T. Rogister, Jr., Kim C. Wetherill, Tharrington, Smith & Hargrove, Raleigh, N.C., on brief, for amicus curiae N.C. School Boards Ass'n.

Before HALL and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge.

K.K. HALL, Circuit Judge:

Peter Duro (Duro) initiated this action against the District Attorney of the Second Judicial District of North Carolina (D.A.) alleging that his religious beliefs were infringed by the North Carolina compulsory school attendance law, N.C.G.S. § 115C–378. The district court entered summary judgment for Duro, from which the D.A. appeals. We find that North Carolina has demonstrated an interest in compulsory ed-

ucation which is of sufficient magnitude to override the religious interest claimed by Duro. Therefore, we reverse.

## I.

Duro, his wife and six children, five of whom are now of school age, have resided in Tyrrell County, North Carolina since January, 1981. Duro and his wife are Pentecostalists. This religion does not require that children be taught at home; in fact, the majority of children whose parents are members of the Pentecostal Church, which the Duros attend, are enrolled in a public school. Notwithstanding this, Duro refuses to enroll his children in a public school or the only available nonpublic school, Cabin Swamp Christian School, operated by the Church of Christ.

According to Duro, exposing his children to others who do not share his religious beliefs would corrupt them. In particular, Duro is opposed to what he terms the "unisex movement where you can't tell the difference between boys and girls and the promotion of secular humanism...." Furthermore, Duro objects to the use of physicians and refuses medical attention for all physical ailments because he believes the Lord will heal any problem. Because of these beliefs, the Duro children are taught in their home away from any "non-Christian beliefs and actions." However, despite Duro's concern that his children be sheltered from corrupting influences, he admits that when they reach eighteen years of age, he expects them to "go out and work ... in the world."

Although Mrs. Duro has assumed the responsibility for teaching the children, she does not possess a teaching certificate and has never been trained as a teacher. She implements a "self-teaching" program, the Alpha Omega Christian Curriculum, which is the same method of instruction used at Cabin Swamp Christian School. Duro himself does not participate in the instruction of the children.

On February 10, 1981, Duro was charged with four counts of violation of the North Carolina compulsory school attendance law, which requires that children between the ages of seven and sixteen must attend school. N.C.G.S. § 115C–378. However, the warrants were quashed because of technical defects. Duro filed this action on April 2, 1981, alleging that the statute in question, as it applied to him, violated the First and Fourteenth Amendments to the United States Constitution because his religious beliefs prohibit him from sending his children to a public or nonpublic school. On August 20, 1982, the district court granted Duro's motion for summary judgment. From that decision, the D.A. appeals.

## II.

The district court relied heavily upon *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), in holding that North Carolina's compulsory school attendance law was unconstitutional, as it applied to Duro. In *Yoder*, the Court held that there are two issues which must be considered in cases such as this: (1) whether a sincere religious belief exists, and (2) whether the state's interest in compulsory education is of sufficient magnitude to override the interest claimed by the parents under the Free Exercise Clause of the First Amendment. The Court recognized that generally a state has a compelling interest in compulsory education, in order to "prepare citizens to participate effectively and intelligently in our political system" and to "prepare individuals to be self-reliant and self-sufficient participants in society." *Id.* at 221, 92 S.Ct. at 1536. The Court employed a balancing process between the state's interest in compulsory education on one hand, and the religious beliefs of parents regarding the upbringing of their children on the other hand.

The district court found that Duro, like the parents in *Yoder*, expressed a sincere religious belief[1] that school enrollment

---

1. According to the district court, Duro based his belief in the scripture. Further, the court

noted that Duro acted "out of an honest convic-

would corrupt his children. We find, however, that the district court, in reaching its conclusion, incorrectly interpreted and applied *Yoder*, because it arose in an entirely different factual context from the present case. Nevertheless, in balancing Duro's religious belief against North Carolina's interest in compulsory education, keeping in mind both the children's future well-being and their state constitutional right to an education, we find the balance in this case tips in favor of the state.

The facts in the present case are readily distinguishable from the situation in *Yoder*. In that case, Amish parents were convicted of violating Wisconsin's compulsory school attendance law by refusing to send their children to public or private school after they had graduated from the eighth grade. The Court, in reversing the parents' convictions and holding that they had a valid First Amendment defense to the prosecution, closely examined and scrutinized the unique nature of the Amish community. The evidence in *Yoder* revealed that the Amish children attended public schools for the first eight grades, following which the Amish provided informal vocational education to prepare their children for life in their rural self-sufficient community. The Court stressed the fact that for almost 300 years the Amish society had not altered their lifestyle, which was centered around a separate agrarian community away from "worldly" influence. Because the Court found that secondary school education emphasizes "intellectual and scientific accomplishments, self-distinction, competitiveness, worldly success and social life with other students," it was held to be contrary to the Amish beliefs and way of life. *Id.* 406 U.S. at 211, 92 S.Ct. at 1531. Thus, the Court concluded that requiring Amish children to be exposed to such influence would pose a threat of undermining the entire Amish community and religion. Therefore, in view of the unique facts and circumstances associated with the Amish community, the Court held that Wisconsin's interest in education was not so compelling as to override the sincere religious beliefs of the Amish.

The Duros, unlike their Amish counterparts, are not members of a community which has existed for three centuries and has a long history of being a successful, self-sufficient, segment of American society. Furthermore, in *Yoder*, the Amish children attended public school through the eighth grade and then obtained informal vocational training to enable them to assimilate into the self-contained Amish community. However, in the present case, Duro refuses to enroll his children in any public or nonpublic school for any length of time, but still expects them to be fully integrated and live normally in the modern world upon reaching the age of 18.

Despite North Carolina's deregulation of nonpublic education,[2] we disagree with the district court that the state has abdicated its interest in the quality of education received by students in nonpublic schools. North Carolina continues to impose compulsory attendance requirements on all religious and nonpublic schools and further, requires that attendance and disease immunization records be maintained for all pupils. The schools are also subject to reasonable fire, health and safety inspections by public authorities. N.C.G.S. §§ 115C–548, 556. Moreover, each religious and nonpublic school is required to administer to all students enrolled in grades one, two, three, six, nine and eleven, a nationally standardized test whereby the state can monitor competency levels. §§ 115C–549, 550, 557,

---

tion that obedience to the compulsory attendance law is forbidden by his religion."

In *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), the Supreme Court addressed the question of what constitutes a religious belief. The Court held that, "religious beliefs need not be acceptable, logical, consistent or comprehensible to others in order to merit First Amendment protection."

*Id.* at 714, 101 S.Ct. at 1430. The Court concluded that the narrow function of a reviewing court is to determine whether there was an appropriate finding that the petitioner acted in an "honest conviction that such [action] was forbidden by his religion." *Id.* at 716, 101 S.Ct. at 1431.

**2.** See N.C.G.S. § 115C–547.

558. Duro has not demonstrated that home instruction will prepare his children to be self-sufficient participants in our modern society or enable them to participate intelligently in our political system, which, as the Supreme Court stated, is a compelling interest of the state. Therefore, based on all the regulations imposed on religious and non-public schools, we find that North Carolina has maintained a compelling interest in compulsory education for the children of the state.[3]

### III.

We find, therefore, that this case is factually distinguishable from *Yoder.* Despite Duro's sincere religious belief, we hold that the welfare of the children is paramount and that their future well-being mandates attendance at a public or nonpublic school.[4] Furthermore, we conclude that North Carolina has demonstrated an interest in compulsory education which is of sufficient magnitude to override Duro's religious interest. Accordingly, the judgment of the district court is reversed.

REVERSED.

SPROUSE, Circuit Judge, concurring:

I concur in my colleague's excellent opinion. If the issues were ones of first impression, I might completely agree, but I feel the majority of the Supreme Court in *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), has established a path from which at times the majority strays.

The majority opinion in *Yoder* categorized two legitimate state interests in the education of children:

█ to prepare [its] citizens to participate effectively and intelligently in our open political system ... [and] ... [2] [to] prepare [its citizens] to be self-reliant and self-sufficient participants in society.

*Id.* at 221, 92 S.Ct. at 1536. Justice White, in a concurring opinion joined by Justices Brennan and Stewart, said that in addition to those interests recognized in the majority opinion, the state has a legitimate interest "in seeking to develop the latent talents of its children [and] in seeking to prepare them for the life style that they may later choose...." *Id.* at 240, 92 S.Ct. at 1545. Justice Douglas, the single dissenter, would have held that expansive constitutional rights attach directly to the children and balance in their favor against the First Amendment freedom-of-religion rights of their parents.

My problems arise from the following portions of the panel majority's opinion: In footnote 3, the majority states

In addition to the mandates of the Supreme Court in *Yoder,* we find that our chief consideration must be the welfare of the Duro children. When we examine their well-being, along with their state constitutional right to an education, we conclude that the children's right to an education that will prepare them for their future is paramount. Article 1, § 15 of the North Carolina Constitution expressly provides that, "[t]he people have a right to the privilege of education and it is the

---

**3.** In addition to the mandates of the Supreme Court in *Yoder,* we find that our chief consideration must be the welfare of the Duro children. When we examine their well-being, along with their state constitutional right to an education, we conclude that the children's right to an education that will prepare them for their future is paramount. Article 1, § 15 of the North Carolina Constitution expressly provides that, "[t]he people have a right to the privilege of education and it is the duty of the State to guard and maintain that right." The Court of Appeals of North Carolina, in *Matter of McMillan,* 30 N.C.App. 235, 237, 226 S.E.2d 693, 695 (1976), a case involving charges of neglect against parents for failing to enroll their children in the public schools, held:

It is fundamental that a child who receives proper care and supervision in modern times is provided a basic education. A child does not receive "proper care" and lives in an "environment injurious to his welfare" when he is deliberately refused this education, and he is "neglected" within the meaning of [the statute].

**4.** Contrary to the concurring opinion, we are not suggesting that the Duro children have a right to choose whether or not to attend public school. We agree that this case in no way involves that issue.

duty of the State to guard and maintain that right."

In the final paragraph of its opinion, the panel majority concludes:

> We find, therefore, that this case is factually distinguishable from *Yoder*. Despite Duro's sincere religious belief, we hold that the welfare of the children is paramount and that their future well-being mandates attendance at a public or non-public school. Furthermore, we conclude that North Carolina has demonstrated an interest in compulsory education, which is of sufficient magnitude to override Duro's religious interest.

· I concur in the above-quoted sections to the extent they may be read as saying that North Carolina has a legitimate interest in the welfare and future well-being of the Duro children.[1] While recognizing that this may be a departure from the *Yoder* majority opinion, I believe such a consideration is appropriate under the facts of this case because of the young ages of the children involved—most of them were of grade school age, unlike the children in *Yoder* who had received eight years of formal education.

I must disagree, however, with two possible inferences which seem to follow from the above-quoted sections of the panel majority's opinion. First, the majority apparently gives weight, in balancing the state's interests, to a provision in the North Carolina Constitution which provides: "[t]he people have a right to the privilege of education and it is the duty of the State to guard and maintain that right." While I applaud that state constitutional expression, North Carolina cannot argue, and we cannot consider, that such expression increases its interests in educating children as against the parents' rights to exercise their religion freely. A state educational policy, constitutional or otherwise, simply is not added to the scales in balancing First Amendment rights. Whatever the balancing factors, they are inherent in the First Amendment itself.

Second, any possible inference from the above-quoted sections that in deciding this case we should consider the rights of the children to choose to attend school as against their parents' religious interests, is improper. The only issue before the court is the constitutionality of a state statute which seeks to compel the Duro parents to send their children to school. The children have not asserted their rights in this case. As Chief Justice Burger noted in *Yoder*, courts should exercise extreme caution in approaching the delicate balance between the Freedom of Exercise clause and the state's vital interest in public education. At the very least, we should decline to theorize on issues which are not factually developed. The posture of this case is not different from the *Yoder* case in which all of the Justices, save the dissent, agreed that their case in no way involved any questions regarding the rights of the children to attend school.

---

**1.** The use of the phrase "welfare and future well-being," I assume, connotes the preparation for participation in our political system and self-reliance explained by the majority in *Yoder*, as well as Justice White's reasoning concerning the development of latent talents and a life-style of the child's choice. Additionally, the language used by my panel colleagues is sufficiently broad to include many other individual values or desires not contemplated by either the majority or concurring opinions in *Yoder*. I would confine the language narrowly to the facts of this case.