852 F.2d 1039
 57 USLW 2091, 48 Ed. Law Rep. 159
 Dr. Doty MURPHY and Phyllis Murphy, husband and wife, Appellants,
v.
The STATE OF ARKANSAS, and Tommy Venters, Director, General
Education Division, Arkansas Department of
Education, Appellees.
 No. 87-1893.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 14, 1988.
Decided July 25, 1988.
 
 John Barry Baker, Fayetteville, Ark., for appellants.
 C.R. McNair, III, Little Rock, Ark., for appellees.
 Before HEANEY and WOLLMAN, Circuit Judges, and BRIGHT, Senior Circuit Judge.
 HEANEY, Circuit Judge.
 
 
 1
 Appellants challenge the decision of the district court upholding the constitutionality of the Arkansas Home School Act, Ark.Code Ann. Secs. 6-15-501--6-15-507. We affirm the decision of the district court.
 
 I. Facts
 
 2
 Doty and Phyllis Murphy are evangelical Christians who believe that "Christian Scriptures require parents to take personal responsibility for every aspect of their children's training and education."[1] They have six children, ages four through eighteen. The Murphys educate their children at home, providing an "education that is pervasively religious in nature and which does not conflict with the religious beliefs they hold, based upon their understanding of the scriptures."
 
 
 3
 Under Arkansas law, a parent must educate her children through the age of sixteen. This requirement may be satisfied by sending the child to public, private, or parochial school or by educating the child at home. The Arkansas Home School Act, Ark.Code Ann. Secs. 6-15-501--6-15-507, requires parents intending to school their children at home to notify in writing the superintendent of their local school district prior to the commencement of each school year. The notice must provide information concerning the name, age, and grade of each student, the core curriculum to be offered, the schedule of instruction and the qualifications of the person teaching. The parent must also agree to submit the children to standardized achievement tests each year and, when the children reach the age of fourteen, to a minimum performance test. All of these tests are administered, interpreted, and acted upon by the Arkansas Department of Education. Finally, the parent must provide any information to the superintendent which might indicate the need for special educational services for the children.
 
 
 4
 The achievement test administered to a student schooled at home is chosen by the parent from a list of nationally recognized tests provided by the director of the State Department of Education or the director's designee. The parent may be present when the standardized test is administered, but both parent and student are under the supervision of a test administrator. The results of the standardized tests are used for several purposes. Most significantly, if a home school student does not achieve a composite score within eight months of grade level in designated subjects, the student must be placed in a public, private, or parochial school. No such annual testing is required for students in public, private, or parochial schools. If children not schooled at home are, for some reason, tested, no remedial placement is required for those who do not achieve certain scores.
 
 
 5
 The Murphys allege that the Arkansas statutory scheme deprives them of the right to free exercise of religion, the right of due process of law, the right of equal protection of the laws, and the right of privacy and parental liberty in violation of the United States Constitution. The Murphys brought an action for a declaratory judgment in federal district court. That court awarded judgment to the state.
 
 II. Discussion
 A. The Free Exercise Clause
 
 6
 The Murphys assert that Ark.Code Ann. Sec. 6-15-504, requiring that a standardized test be given to their children under the supervision of a test administrator deprives them of the right to free exercise of religion as guaranteed by the first amendment. They argue that their religious beliefs require they must be completely responsible for every aspect of their children's education. In contrast, the Arkansas Home School Act places responsibility for testing and interpreting test results with the State of Arkansas, rather than with the parents.
 
 
 7
 To determine whether governmental conduct infringes upon an individual's first amendment free exercise rights, a court must first inquire whether the challenged governmental action interferes with the claimant's "sincerely held religious beliefs."[2] Second, if such a belief is interfered with, the court must determine whether the governmental action is the least restrictive means of achieving some compelling governmental interest. Wisconsin v. Yoder, 406 U.S. 205, 214-15, 92 S.Ct. 1526, 1532-33, 32 L.Ed.2d 15 (1972).
 
 
 8
 In the case before us, the parties have stipulated that the testing requirements of the Arkansas law interfere with the Murphys' sincerely held religious beliefs. Thus, we will go no further in examining the subtleties of the Murphys' beliefs. Consequently, the resolution of the free exercise claim involves answering two related questions: First, does the state have a compelling interest in the education of all children? Second, if so, is the Arkansas statutory scheme the least restrictive means of achieving that objective? We believe that the answer to both of these questions is yes.
 
 
 9
 The government has a compelling interest in educating all of its citizens. Education of the citizenry is and always has been a preeminent goal of American society.[3] Reaching back through the collective memory of the Republic, the fundamental importance of education in the design of our system of government rapidly becomes clear. Article III of the Northwest Ordinance states in part: "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." In Yoder, the Supreme Court adopted Thomas Jefferson's often expressed belief that education was a "bulwark" against tyranny. Specifically, the Court stated:Thomas Jefferson pointed out early in our history, that some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence. Further, education prepares individuals to be self-reliant and self-sufficient participants in society.
 
 
 10
 406 U.S. at 221, 92 S.Ct. at 1536.
 
 
 11
 The fundamental importance of education in terms of access and achievement in American society was further underscored by the Court in Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954), where it stated:
 
 
 12
 Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed force. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.
 
 
 13
 Following from these recognized concerns, the Supreme Court has observed that
 
 
 14
 a substantial body of case law has confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction.
 
 
 15
 Board of Education v. Allen, 392 U.S. 236, 245-46, 88 S.Ct. 1923, 1927-28, 20 L.Ed.2d 1060 (1968) (footnote omitted).[4]
 
 
 16
 Thus, as the district court correctly noted, it is "settled beyond dispute, as a legal matter, that the state has a compelling interest in ensuring that all its citizens are being adequately educated."
 
 
 17
 Given the existence of a compelling governmental interest, we must next inquire whether Arkansas' home testing system is the least restrictive means to achieve that purpose. In doing so, we recognize that the state must have a mechanism by which it can confidently and objectively be assured that its citizens are being adequately educated.
 
 
 18
 Upon examination, it would appear that Arkansas has created the least restrictive system possible to assure its goal. By providing the option of home schooling, Arkansas allows parents vast responsibility and accountability in terms of their children's education--control far in excess of limitations on religious rights that have been previously upheld. For example, in Fellowship Baptist Church v. Benton, 815 F.2d 485 (8th Cir.1987), this Court upheld the power of the State of Iowa to require teachers in "church schools" to be certified by the state for basic competence. On remand, the district court upheld regulations prescribing curriculum in such schools. Fellowship Baptist Church v. Benton, 678 F.Supp. 213 (S.D.Iowa 1988). In contrast, Arkansas requires neither that the parent instructing the home-schooled child be a certified teacher nor that the parent follow a mandated curriculum. The state's only safeguard to ensure adequate training of the home-schooled student is the standardized achievement test.[5] Even regarding this test, the state allows wide latitude to the parents. The parent may choose a test administered from a list of nationally recognized standard achievement tests and may be present while the test is administered.
 
 
 19
 Finally, the Murphys make no showing, as made by the Amish in Yoder, that the state can be assured its interest will be attained if appellants' religious beliefs are accommodated. We reject the Murphys' argument that parental "testing" of children provides a sufficient safeguard to assure the state's interest in education is protected. Likewise, parental affidavits concerning the children's progress would also be insufficient. In the end, we believe that the state has no means less restrictive than its administration of achievement tests to ensure that its citizens are being properly educated.
 
 B. Equal Protection
 
 20
 The Murphys argue that the Arkansas Home School Act violates the equal protection clause of the fourteenth amendment. Specifically, they claim that those who school their children at home for religious reasons are a suspect class or that parental control over a child's education involves a fundamental right. Further, they argue that, because the Home School Act discriminates against this class or burdens this right, it fails the strict scrutiny test of the equal protection clause. Alternatively, the Murphys assert that the Home School Act requires various filings with the local superintendent, testing by the state, and remedial action for unsatisfactory test results, while no such requirements are imposed on persons who educate their children in public or private schools. Moreover, although the public schools are subject to pervasive regulation, the Murphys point out that private schools are virtually free of any such supervision. Thus, the Murphys contend that the state appears irrationally to allow parents to educate their children in religious private schools without any state regulatory supervision but subjects children schooled at home to the various requirements of the Home School Act.
 
 
 21
 While home school families impelled by deep-seated religious convictions might be the type of "discrete and insular minorit[y]" to which Justice Stone referred in footnote four of United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), the broad secular category of individuals who prefer to school their children at home is not. Clearly, the statute is aimed at this second category of individuals.
 
 
 22
 It could be argued that the statute, while superficially neutral, has a discriminatory impact on the category of deeply religious individuals impelled by their convictions to school their children at home. Yet, even if such discriminatory impact were shown--which it has not been--this would not be sufficient to invoke strict scrutiny. The Murphys would still bear the burden of proving discriminatory purpose or intent. Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Because no such showing of either discriminatory impact or discriminatory intent has been made, strict scrutiny analysis is inappropriate here.
 
 
 23
 Second, we find no persuasive arguments advanced that there is a fundamental right of parents to supervise their children's education to the extent that the Murphys contend. The recognition of such a right would fly directly in the face of those cases in which the Supreme Court has recognized the broad power of the state to compel school attendance and regulate curriculum and teacher certification. See Board of Education v. Allen, 392 U.S. at 245-46, 88 S.Ct. at 1927-28; Pierce v. Society of Sisters, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). Thus, again, strict scrutiny cannot be invoked in this case.
 
 
 24
 Given that strict scrutiny analysis does not apply, we move to the question of whether Arkansas has a rational reason to subject home schooling to regulatory requirements, while at the same time freeing private schools from virtually any regulation. This step by the legislature in Arkansas may at first glance offend common sense, and, sitting as a legislature, we might not have made this same decision. However, our job is not to sit as a legislature and the constitutional standard of rationality under the equal protection clause is a relaxed one. In this area of the law, the Supreme Court has declared its willingness to uphold any classification based "upon [any] state of facts that reasonably can be conceived to constitute a distinction, or difference in state policy * * *." Allied Stores v. Bowers, 358 U.S. 522, 530, 79 S.Ct. 437, 443, 3 L.Ed.2d 480 (1959).
 
 
 25
 We believe that such a state of facts exists here. First, it could be argued that the notion of an actual independent school, away from home, implies more formality and structure than a home school. This could lead the state to believe that more serious instruction would be occurring there than in the relaxed atmosphere of a child and parents in their own home. Second, the notion that more than one family is likely to be sending their children to the private school may provide an additional objective indication of the private school's quality that is not present in the context of individual home schools. Finally, unlike a home-school, parents sending a child to a private school have to pay money for education and, hence, would be more likely to demand their money's worth of instructional quality from the private school. All these possibilities together could provide Arkansas with a passable reason for the challenged distinction under the minimum rationality standards of the equal protection clause.
 
 C. Right of Privacy
 
 26
 The Murphys argue that the right of privacy should be extended to protect parental decisions concerning the direction of a child's education from state interference.
 
 
 27
 In Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the Supreme Court specifically rejected this contention, stating:
 
 
 28
 A person's decision whether to bear a child and a parent's decision concerning the manner in which his child is to be educated may fairly be characterized as exercises of familial rights and responsibilities. But it does not follow that because the government is largely or even entirely precluded from regulating the child-bearing decision, it is similarly restricted by the Constitution from regulating the implementation of parental decisions concerning a child's education.
 
 
 29
 The Court has repeatedly stressed that while parents have a constitutional right to send their children to private schools and a constitutional right to select private schools that offer specialized instruction, they have no constitutional right to provide their children with private school education unfettered by reasonable government regulation. * * * Indeed, the Court in Pierce expressly acknowledged "the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils."
 
 
 30
 427 U.S. at 178, 96 S.Ct. at 2598 (citations omitted).
 
 
 31
 The Supreme Court has spoken clearly on this issue, and we are bound by its decision. Moreover, we agree with the Court's reasoning and its conclusion. We thus decline to extend the right of privacy to this situation.
 
 III. Conclusion
 
 32
 For the foregoing reasons, the decision of the district court is affirmed.
 
 
 
 [1]
 Appellants' brief asserts, "[t]heir belief that they are ultimately and solely responsible for every aspect of the education of their children is based upon their understanding and interpretation of the Bible and based upon such scriptures as Proverbs 22:6:
 'Train a child on the way he should go, and when he is old he will not depart from it.'
 and Deuteronomy 6:4-9:
 'Hear, Oh Israel; The Lord our God, the Lord is one. Love the Lord your God with all your strength. These commandments that I give you today are to be upon your hearts. Impress them on your children. Talk about them when you sit at home and when you lie down and when you get up. Tie them as cymbals to your hands and bind them on your foreheads. Write them on the doorframe of your houses and on your gates.'
 and Deuteronomy 11:19-12a:
 'Teach them to your children talking about them when you sit at home and when you walk along the road, when you lie down and when you get up ... so that your days and the days of your children may be many in the land and that the Lord swore to give your forefathers.' "
 Brief for Appellants at 12.
 
 
 [2]
 In determining whether the religious beliefs are sincerely held, the court will not second-guess the acceptability, logic, consistency, or comprehensibility of these beliefs, for "[c]ourts are not arbiters of scriptural interpretation." Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 707, 714, 716, 101 S.Ct. 1425, 1430, 1431, 67 L.Ed.2d 624 (1981)
 
 
 [3]
 Philip Kurland has written, "It has long been an American dream that education affords a means for upward mobility in an open society. The Supreme Court * * * has framed much of the country's constitutional law on the unstated premise that formal education is the means by which American society remains fluid yet cohesive, pluralistic yet unitary, aspiring to be a democracy while being governed by a meritocracy." P. Kurland, The Supreme Court, Compulsory Education, and the First Amendment Religion Clauses, 75 W.Va.L.Rev. 213 (1973)
 
 
 [4]
 In relevant dicta, the Court continued:
 Indeed, the State's interest in assuring that these standards are being met has been considered a sufficient reason for refusing to accept instruction at home as compliance with compulsory education statutes. These cases were a sensible corollary of Pierce v. Society of Sisters, [268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) ]: if the State must satisfy its interest in secular education through the instrument of private schools, it has a proper interest in the manner in which those schools perform their secular function.
 Id. at 246-47, 88 S.Ct. at 1928.
 
 
 [5]
 We note with interest that the Murphys state they "have tested their children using nationally recognized standardized tests in order to determine if their [children's] progress was sufficient." Brief for Appellants at 21