Robert P. BLOUNT et al.

v.

DEPARTMENT OF EDUCATIONAL AND CULTURAL SERVICES et al.

Supreme Judicial Court of Maine.

Argued Sept. 22, 1988.

Decided Dec. 20, 1988.

Samuel W. Lanham, Jr. (orally), Cuddy & Lanham, Bangor, for plaintiffs.

Christopher J. Klicka, Home School Legal Defense Ass'n, Great Falls, Va., for amicus curiae.

James E. Tierney, Atty. Gen., Peter J. Brann (orally), Asst. Atty. Gen., Augusta, for defendants.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD and COLLINS, JJ.

McKUSICK, Chief Justice.

When we affirmed the validity of state regulation of home schooling in *State v. McDonough*, 468 A.2d 977 (Me.1983), we observed that the McDonoughs had not argued that the State interfered with their free exercise of religion protected by both the Maine and the United States Constitu-

tions. *Id.* at 979. Robert and Susan Blount of Vassalboro now raise the question left open in *McDonough*. Finding our reasoning in that case still persuasive in the context of the Blounts' religious freedom claim, we affirm the judgment of the Superior Court (Kennebec County; *Brody, C.J.*) denying the Blounts' constitutional challenges to the State's prior approval requirement as applied to the home schooling the Blounts are giving their four daughters.

The compulsory education statute requires that the Blount children either "attend[ ] a public day school" or "obtain[ ] equivalent instruction ... [that] is approved by the commissioner [of Educational and Cultural Services]." 20–A M.R.S.A. § 5001–A(3)(A)(1) (Supp.1988).[1] The Blounts believe that any judgment by government officials of the merits of parents' educational choices is a usurpation by the State of the God-given, constitutionally protected religious autonomy of the family. Moreover, the Blounts believe that any participation by them in a state approval process would be a renunciation of their faith in favor of secular authority.

Although both sides have made offers aimed at mitigating the conflict, they remain at an impasse. The Blounts have offered to provide all information that school officials reasonably request, but only if the officials assure them that the information will not be used in an approval process. The officials responsible for overseeing the Blounts' home schooling program have agreed to waive the requirement that the Blounts apply for approval, 05–071 Code Me.Rules ch. 130, § 1(C), but they will not abjure their approval authority over the home schooling program.

---

1. The full text of the pertinent statutory provisions is:

 **1. Requirement.** Persons 7 years of age or older and under 17 years shall attend a public day school during the time it is in regular session.

 ....

 **3. Alternatives to attendance at public day school.** Alternatives to attendance at public day school are as follows.

 **A.** Equivalent instruction alternatives are as follows.

 **(1)** A person shall be excused from attending a public day school if the person obtains *equivalent instruction in a private school or in any other manner* arranged for by the school board and if the equivalent instruction is approved by the commissioner.

20–A M.R.S.A. § 5001–A (Supp.1988). The Blounts do not qualify for, nor do they claim, any statutory exemption from public school attendance other than that provided in subparagraph 5001–A(3)(A)(1).

The Blounts have borne witness to the depth of their conviction by the manner in which this litigation arose. In December 1983 they received a copy of a letter announcing that "the commissioner [would] grant approval for the[ir] home-study request." At the time they had been educating their two eldest daughters at their farm home in Vassalboro since January of 1982.[2] In the spring of 1983 Susan Blount had delivered a speech advocating home schooling. Shortly thereafter an anonymous informant wrote the school nurse in Winslow (an adjacent town in the same school union as Vassalboro) that the Blount children were not attending school, and the superintendent of schools then wrote the Blounts to explain the procedure for approval of home schooling programs.

The ensuing negotiations between the Blounts and the Vassalboro school officials seemed at one point to reach a successful outcome. On being notified of official approval, however, Susan Blount wrote, "We never asked for it!" on her copy of the letter. The Blounts announced that they could no longer share information with the school committee if the committee might use the information in an approval process. The parties could find no mutually acceptable compromise, and a closely divided Vassalboro School Committee finally voted in the fall of 1986 to refer the matter to the Kennebec County District Attorney for civil truancy proceedings against the Blounts.

On learning of the school committee vote, the Blounts filed a civil rights suit in the United States District Court, but that court in denying the Blounts a temporary restraining order announced its intention to abstain from exercising federal jurisdiction in light of the state truancy action that by then was pending. *Blount v. Redmond,* 649 F.Supp. 319, 330 (D.Me.1986) (*Cyr, C.J.*) (citing *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)). The Blounts then brought this action in the Superior Court against the Department of Educational and Cultural Services and the state and local officials responsible for overseeing their home schooling program. Their complaint seeks a declaration that their program has been in compliance with the compulsory education law, 20–A M.R.S. A. § 5001–A, and that any licensing power asserted by the State violates several guarantees of the Maine and United States Constitutions, including in particular the Free Exercise Clauses of the First Amendment and the Maine Declaration of Rights. They also sought the injunctive relief necessary to enforce their claim, and costs and attorney fees under 42 U.S.C. § 1988 (1982).[3] The Superior Court entered judgment for all defendants on all eight counts, and we affirm.

## I. *The Federal Free Exercise Challenge*

Supreme Court decisions over the last quarter-century have yielded a four-stage framework for analysis of claims of violation of the Free Exercise Clause of the First Amendment. Initially, the burden of proof is on the person raising the constitutional challenge to the government regulation in question. The challenger must initially demonstrate:

1) that the activity burdened by the regulation is motivated by a sincerely held religious belief; and

2) that the challenged regulation restrains the free exercise of that religious belief.

If the challenger meets that two-fold threshold requirement, the burden shifts and the State can prevail only by proving both:

3) that the challenged regulation is motivated by a compelling public interest; and

4) that no less restrictive means can adequately achieve that compelling public interest.

*See, e.g., Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 107 S.Ct. 1046, 1048–49, 94 L.Ed.2d 190 (1978); *United States v. Lee,* 455 U.S. 252, 257, 102

---

**2.** They now have four daughters in their home schooling program, whose approximate ages range from seven to fourteen.

**3.** The District Court (Waterville; *Russell, J.*) has stayed the truancy proceedings pending the outcome of the constitutional litigation.

S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982); *Wisconsin v. Yoder*, 406 U.S. 205, 214–15, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972); *see also Bangor Baptist Church v. Maine Dept. of Educ. & Cultural Services*, 549 F.Supp. 1208, 1217 (D.Me.1982) (granting partial summary judgment), *final judgment rendered*, 576 F.Supp. 1299 (1983).

### A. The burden on the Blounts' religious exercise

The sincerity of the Blounts' religious beliefs being unquestioned, we begin our inquiry with the nature and severity of the burden imposed by the prior approval requirements of the compulsory education statute and the home schooling rule. The Attorney General, representing the defendant school authorities, seeks to minimize this burden, observing that the Blounts, the only home schooling family in their congregation, have acknowledged on cross-examination that it is not "a fundamental tenet of being a fundamental Christian ... that a parent should teach, must teach their children at home." This argument is misplaced for two reasons. First, the issue is the Blounts' own beliefs, not those of their co-parishioners. *Thomas v. Review Board*, 450 U.S. 707, 715, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981); *Dotter v. Maine Employment Sec. Comm'n*, 435 A.2d 1368, 1371 (Me.1981). The Blounts' testimony that God has called them to educate their children at home is perfectly consistent with their testimony that they believe other families have different callings. Second, a focus on the Blounts' belief in the desirability of home education, a belief that is not significantly burdened by Maine law, would misdirect the inquiry. At the heart of the Blounts' civil disobedience, rather, is their belief that to apply for state approval for their home schooling program, or in any other way to acknowledge the State's authority to approve or to disapprove alternatives to compulsory public education, would be an act of apostasy.

The Blounts, as many others, believe that parents' sovereignty over the spiritual development of their children is divinely ordained and that parents in this sphere are responsible immediately to God. From the Blounts' standpoint the State may properly offer its services as an educational consultant but may not make the final decisions on educational quality that God has delegated to parents. For them to relinquish their responsibility to the State "would exalt Caesar's law above the Lord's." The Blounts do not reject all involvement by the State in education: indeed, Susan Blount still holds a valid Maine teacher's certificate. They are willing to share information with school officials and even engage in dialogue over their children's educational development—but they will cooperate with the State only if the State will acknowledge that its role is purely advisory.

 The martyrology of many faiths is filled with stories of heroes who have refused to confess to the primacy of the State. Out of concern for this tradition, the Supreme Court has held that mandatory flag salutes are unconstitutional. *West Virginia State Board of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). For the Blounts, as for many parents and educators with similar beliefs, application for state approval has the same symbolic significance and places a substantial burden on their religious exercise. *See, e.g., Bangor Baptist Church v. Maine Dept. of Educ. & Cultural Services*, 549 F.Supp. at 1216–20, 576 F.Supp. at 1302–08; *Care and Protection of Charles*, 399 Mass. 324, 333 n. 8, 504 N.E.2d 592, 598 n. 8 (1987); *Murphy v. Arkansas*, 852 F.2d 1039, 1040–41 (8th Cir.1988); *North Valley Baptist Church v. McMahon*, 696 F.Supp. 518 (E.D.Cal.1988); *Jones v. The Queen*, [1986] 2 S.C.R. 284, 291 (Canada). *See generally* Lupu, *Home Education, Religious Liberty, and the Separation of Powers*, 67 B.U.L.Rev. 971, 973 n. 12, 982–84 (1987). The Blounts have shown that the State imposes a significant restraint on their exercise of a sincerely held religious belief; thus they have succeeded in shifting the burden of proof on the rest of the four-part analysis to the State. To prevail, the State must now demonstrate affirmatively that the State's requirement of prior approval for home schooling programs is

motivated by a compelling public interest *and* that there is no less restrictive means for achieving that interest.

### B. The compelling public interest in educational quality

Although the burden on the Blounts' religious exercise is sufficient to trigger strict scrutiny of the State's regulation of home schooling, *see Hobbie v. Unemployment Appeals Comm'n,* 107 S.Ct. at 1049, the belief by some citizens that compliance with a given law is sinful does not necessarily make the law unconstitutional, nor does it necessarily obligate the State to exempt conscientious objectors from compliance. *See United States v. Lee,* 455 U.S. at 257, 102 S.Ct. at 1055 (requiring Old Order Amish to pay Social Security taxes, notwithstanding their belief that contributing to the Social Security program encourages members of the community to neglect their religious duty to support their own elders and deprives them of resources they need to meet this obligation). The burden of proof, however, has now shifted to the State.

In giving strict scrutiny to the State's claim of a compelling interest, we must keep in mind that every individual's freedom of religion is itself one of the most compelling public interests. To justify a regulation that has been shown to diminish that freedom, the State must prove that the social purpose served by the challenged regulation is so essential that the loss in freedom is clearly outweighed by the benefit. "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533, *quoted in Thomas v. Review Board,* 450 U.S. at 718, 101 S.Ct. at 1432.

We conclude that the State has here met its burden. "[E]ducation is perhaps the most important function of state and local governments.... It is the very foundation of good citizenship.... In these days, it is doubtful that any child may reasonably be expected to succeed in life ... denied the opportunity of an education." *Brown v. Board of Educ.,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). It stands as a tribute to the importance of education that so much of the struggle for civil rights has been fought at the schoolhouse door.

At the Maine Constitutional Convention in October 1819, Judge Judah Dana said that "no subject has, or can come before this Convention of deeper interest to the State; whatever constitution we may form and send out to the people, however excellent it may be in other respects, unless it contains ample provision for the education of our youth, it will be materially deficient.... [A] free government rest[s] on the virtue and intelligence of the people...." J. Perley, *Debates, Resolutions, and Other Proceedings of the Convention of Delegates* 280–81 (1820). Out of that Convention came Article VIII that declares, even to this day, the public policy of the State of Maine:

A general diffusion of the advantages of education [is] essential to the preservation of the rights and liberties of the people....

Me. Const. art. VIII, pt. 1, § 1. As the United States Supreme Court has recognized, education "ranks at the very apex of the function of a State." *Wisconsin v. Yoder,* 406 U.S. at 213, 92 S.Ct. at 1532.

Just as it was important to recognize that the religious belief of the Blounts that is here at stake is not the belief in home education but the belief in parental sovereignty over the religious life of the family, it is also important to recognize that the State's interest is not simply an interest in education but an interest in the quality of education. *See Care and Protection of Charles,* 399 Mass. at 336, 504 N.E.2d at 599–600. The steps the Blounts have taken attest to their own concerns that their children's educational needs be met. It would eviscerate the State's interest in education to restrict it to assuring the mere physical presence of school children in some facility purporting to be a classroom. *See State v. McDonough,* 468 A.2d at 980.

Thus, "it is 'settled beyond dispute, as a legal matter, that the state has a compelling interest in ensuring that all its citizens are being adequately educated.'" *Murphy v. Arkansas*, 852 F.2d at 1042 (quoting opinion of trial court). The Blounts contend, however, that even if this is true as a general proposition, any prior approval requirement intended to ensure adequate education must yield when necessary to accommodate religious conscientious objectors. That parents like the Blounts are motivated by their own concerns for educational quality, they argue, gives sufficient protection to the State's interest, so that there is no need for the State to interfere more deeply with the parents' exercise of their religious beliefs. We are not persuaded. For the State to set educational standards that home schooling parents must follow, but then give plenary enforcement power to the parents themselves, would establish a regime of "voluntary compulsory education." Universal education is too precious to our society to allow some parents to opt out, however high their motive.

■ The State has therefore structured its compulsory education requirement as one of "equivalent instruction" to that given in the public schools. 20–A M.R.S.A. § 5001–A(3)(A)(1). In enforcing this provision the State must proceed with care. It would be an unconstitutional deprivation of religious freedom to require all instruction satisfying the compulsory attendance law to be given in a public school, *see Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), or in a clone of a public school, *see State v. Whisner*, 47 Ohio St.2d 181, 351 N.E.2d 750 (1976). But in the case at bar the Blounts do not suggest that any such oppression has been practiced by the State or the local school authorities. If an equivalent instruction program is unreasonably disapproved, and the administrative remedies provided in 05–071 Code Me.Rules ch. 130, § 2 do not bring adequate relief, the courts are available to correct the injustice.

### C. The least restrictive means

■ Strict scrutiny does not end with the State's proof that its interest, in the abstract, is sufficiently compelling to warrant a burden on the Blounts' religious exercise. The State must also prove that prior approval of their home schooling program is the least restrictive means by which the public interest in educational quality can be adequately fulfilled. Despite its categorical phrasing, the "least restrictive means" analysis amounts to a balancing test: the State must prove that all less restrictive means advanced by the Blounts would cause too much harm to the public interest in educational quality to justify the increased benefit to the Blounts' exercise of religion. *See Thomas v. Review Board*, 450 U.S. at 718–19, 101 S.Ct. at 1432; *Wisconsin v. Yoder*, 406 U.S. at 214–15, 92 S.Ct. at 1532–33; *Developments in the Law—Religion and the State*, 100 Harv.L. Rev. 1606, 1704 (1987). The State need not meet the impossible standard of proving that no adequate less restrictive alternative *can* be developed, only that none *has* been proposed.

### 1. "Private School" status as a less restrictive means

The Blounts argue that the Department of Educational and Cultural Services has already adopted a less restrictive means of verifying "equivalent instruction," one that is by its terms applicable to "private schools," but that the Department has arbitrarily precluded the Blounts from availing themselves of this less restrictive procedure by defining "private school" so as to exclude all home schooling programs. The less restrictive alternative urged by the Blounts is the Guidelines for Equivalent Instruction in Non–Approved Private Schools, which were adopted by the Commissioner in response to the United States District Court's decision in the *Bangor Baptist* litigation. *See Bangor Baptist Church v. Maine Dept. of Educ. & Cultural Services*, 576 F.Supp. at 1321. Under those Guidelines, "A non-approved private school may file with the Commissioner an annual letter. [Timely r]eceipt of the annual letter ... shall constitute sufficient evi-

dence, to establish that students in attendance at that school are receiving equivalent instruction, for purposes of compliance with the compulsory attendance law." [4] The Blounts, calling themselves "Stag Head Farm Academy," have sent letters purporting to comply with the Guidelines. The Department has rejected those filings, however, because its regulation of nonapproved private schools under the Guidelines is distinct from its regulation of "equivalent instruction programs, commonly referred to as 'home schooling,'" under the Rules for Equivalent Instruction Programs, 05–071 Code Me.Rules ch. 130. What distinguishes "private schools" from home schooling programs is the "enroll[ment of] two or more unrelated students." *Id.*, § 1(A)(3).

Thus, the Blounts are by definition subject to the Department's Rules applicable to home schooling programs rather than to its Guidelines applicable to private schools. The Rules, like the Guidelines, require teacher competence, compliance with state curriculum and calendar standards, and assessment of students' academic progress. Apart from the requirement that parents apply to their local school board for approval—a requirement that the Vassalboro School Committee has waived in its effort to accommodate the Blounts' conscientious objection—the Rules differ from the Guidelines primarily in providing for closer supervision by local school officials and in spelling out more detailed standards for compliance. The standards, however, remain flexible. The parents can arrange for the assessment of the child's academic progress, for example, either by annual standardized testing, or by annual examination by a certified teacher, or by review under the auspices of an official state or local home schooling advisory board, or by "a locally developed test appropriate to the educational plan." 05–071 Code Me.Rules ch. 130, § 1(C)(2)(c)(ii). Similarly, a home

schooling program must have a tutor who either is (like Susan Blount) eligible for state certification or is "assisted by a satisfactory support system"; the last of four listed alternatives for satisfying the support system requirement is "provision for a support system which otherwise satisfies the Commissioner." *Id.*, § 1(C)(2)(a)(ii)(dd).

The Blounts argue that the State's distinction between home schooling programs and private schools is arbitrary and that any valid reason the State might have for supervising home schooling more closely than organized private schools cannot be grounded in a public interest sufficiently compelling to allow the State to enforce this distinction against religious conscientious objectors. We disagree.

The reason the State may monitor organized schools at a distance is the presence of an active intermediary and monitor—the parents. In schooling given at home solely by the parents of the pupils, the parents by the nature of things cannot give the program the same arm's length supervision. The "private schools" to which the State grants a greater measure of autonomy, under the definition the Blounts challenge, are those educational programs in which teachers have taken on the responsibility of educating some child unrelated to them, and parents have entrusted their children to some other teacher, and students spend the school day with some classmates who are not their siblings.

The State has proven that the availability of the procedure set forth in the Guidelines to those schools, but only those schools, whose enrollment draws from more than a single family represents the maximal accommodation it can make to conscientious objection to state regulation without sacrificing its compelling interest in educational quality. The additional burden imposed on home schooling families such as the Blounts, who instead operate under the Rules, is far outweighed by the benefit to

---

**4.** In the annual letter, the school's "chief administrative officer" must certify that the school complies with fire, health, and safety laws; that the school meets subject matter and calendar requirements imposed by the State; that the administration of the school has examined all teachers for competency and approved them; and that the school takes attendance, assesses pupils' academic progress, and gives parents quarterly progress reports, explaining to the parents its methods of testing and grading.

the public interest in education. The additional information required under the Rules but not the Guidelines was information the Blounts had no intrinsic objection to providing, had it been part of a consultation rather than an approval process. The presumption of approval the Blounts wished to invoke under the Guidelines is at least in principle rebuttable and is backed by the threat of truancy prosecution. Guidelines at § 7. In practice, the Blounts would have equal assurance of approval under the Rules as under the Guidelines. The Rules can reasonably accommodate any conflict short of a categorical objection to the State's regulatory authority; no reasonable compulsory education scheme can accommodate that last, irreconcilable objection.

At least two United States courts of appeals have similarly upheld state laws distinguishing between private schools and home schooling programs in the face of similar, religiously based attacks by home schooling parents. In each case, the court upheld home schooling regulations more restrictive than Maine's (in the *Duro* case, at least as interpreted by local school officials, a total ban), notwithstanding "North Carolina's deregulation of nonpublic education," *Duro v. District Attorney*, 712 F.2d 96, 98 (4th Cir.1983), *cert. denied*, 465 U.S. 1006, 104 S.Ct. 998, 79 L.Ed.2d 230 (1984), and Arkansas' similar decision to leave "private schools ... virtually free of any [regulatory] supervision," *Murphy v. Arkansas*, 852 F.2d 1039, 1043 (8th Cir. 1988). Indeed, even the unique case cited by the Blounts in which a prior approval regulation was overturned on free exercise grounds involved a school rather than a home education program, and expressly justified its deregulation of the school in part by the ability to regulate the parents instead. *See New Life Baptist Church Academy v. Town of East Longmeadow*, 666 F.Supp. 293, 307 (D.Mass.1988), *appeal pending*, No. 88–1610 (1st Cir.).

### 2. *Regulations in other states as less restrictive means*

The Blounts also argue that other states, by their less restrictive regulation of home schooling, have demonstrated that Maine has not chosen the least restrictive means of fulfilling its compelling interest in educational quality. They have made no showing, however, that Maine's home schooling rules are unusually restrictive. The hallmark of the Maine approach to home schooling is its flexibility; many procedures mandated in other states are available as options in Maine.

Nevertheless, it is undeniable that many states have chosen an even less restrictive approach to home schooling. Their choices, however, are entitled to no more deference than are any other proposed regulatory alternatives. The least restrictive means need not be the lowest common denominator. A state that chooses to weigh its interest in educational quality more lightly cannot thereby unilaterally make federal constitutional law. Home schooling regulations far more restrictive than Maine's, such as teacher certification requirements, *see, e.g., State v. Patzer*, 382 N.W.2d 631 (N.D.), *cert. denied*, 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 50 (1986), or even a total ban, *see, e.g., Duro v. District Attorney*, 712 F.2d 96, are not on that account invalid.

The less restrictive alternative the Blounts offer as the most promising is reliance on standardized testing, but this would satisfy neither the Blounts' interest nor the State's. Susan Blount has testified that she could submit test scores to the school committee only "[a]s long as it had no attachment to an approval process." It strains the imagination to envision how testing can function as a substitute for state approval rather than as a mechanism for approval. What is the State's interest in having these scores in its archives if it is powerless to take any action thereon?

Even as an enforcement technique, exclusive reliance on standardized testing would be inadequate to protect the public interest in educational quality. If the State is perceived as being interested only in standardized test scores, it creates incentives to turn instruction into exam coaching. *See Sheridan Road Baptist Church v. Department of Educ.*, 426 Mich. 462, 484, 396 N.W.2d 373, 382–83 (1986), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d

839 (1987). Prior review performs essential functions of assuring program quality that would be neglected if the State were barred from becoming involved until at least a year of inadequate instruction has already done its harm.

The question in this case is not, as the Blounts have phrased it, "whether their school can exist," but rather what conditions the State can impose before attendance therein can fulfill the requirements of Maine's compulsory education law. We conclude that the State has met its burden of proving that any alternative regulatory scheme less restrictive than prior approval would result in too great a sacrifice to the compelling public interest in educational quality.

## II. *Other Constitutional Challenges*

 The Blounts also appeal the judgment of the Superior Court on three of their other constitutional claims: free exercise of religion guaranteed under the Maine Declaration of Rights, Me. Const. art. I, § 3; [5] and equal protection and due process guaranteed under both the Maine and the United States Constitutions, U.S. Const. amend XIV, Me. Const. art. I, § 6–A. We conclude that the full range of protection afforded the Blounts by the Maine Constitution is also available under the United States Constitution. Similarly, the equal protection and due process clauses of the two Constitutions provide no additional protection in this case beyond that provided by the free exercise clauses.

The Blounts' claim under the state Free Exercise Clause is premised on a contention that the Maine Constitution, by the language of the text and the record of the framers' debates, provides more protection for religious practice and less protection for countervailing public interests than does the United States Constitution. The Blounts' textual argument cannot survive a comparison of the two texts. Maine's qualifying phrase "provided that that person does not disturb the public peace, nor obstruct others in their religious worship" cannot be read as giving *less* weight to "compelling public interests" than does the unqualified language of the First Amendment forbidding any "law ... prohibiting the free exercise thereof." Moreover, the framers of the Maine Constitution, having expressly declared that a "general diffusion of the advantages of education [is] essential to the preservation of the rights and liberties of the people," laid upon the legislature and the municipalities the obligation to see that suitable provision is made for the support and maintenance of public schools. Me. Const. art. VIII, pt. 1, § 1. This section, which has no federal counterpart, survives today without change.

The Blounts' equal protection claim is a reprise of their earlier argument that the distinction between home schooling programs and private schools is unconstitutional. This distinction has already withstood the Blounts' strongest attack: its interference with their religious exercise. When the distinction is viewed as a restraint on religion, it does not become any more pernicious by being a "classification." The equal protection clause acquires independent value in this case only if we set the burden on religion to one side and analyze the classification as it was intended by the Department—simply as an educational de-

5. Section 3 of the Declaration of Rights reads as follows:

**Religious freedom; sects equal; religious tests prohibited; religious teachers**
Section 3. All individuals have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences, and no person shall be hurt, molested or restrained in that person's liberty or estate for worshipping God in the manner and season most agreeable to the dictates of that person's own conscience, nor for that person's religious professions or sentiments, provided that that person does not disturb the public peace, nor obstruct others in their religious worship;—and all persons demeaning themselves peaceably, as good members of the State, shall be equally under the protection of the laws, and no subordination nor preference of any one sect or denomination to another shall ever be established by law, nor shall any religious test be required as a qualification for any office or trust, under this State; and all religious societies in this State, whether incorporate or unincorporate, shall at all times have the exclusive right of electing their public teachers, and contracting with them for their support and maintenance.

**1386**

cision. As such, it is subject only to rational basis scrutiny. *See Murphy v. Arkansas*, 852 F.2d at 1043–44. Having already survived strict scrutiny under the First Amendment, it easily passes the rationality test.

Finally, the substantive due process claim has no merit. The Blounts argue that their family is indisputably a "private school" under both the ordinary meaning of the term and its statutory definition: "an academy, seminary, institute or other private corporation or body formed for educational purposes...." 20–A M.R.S.A. § 1(22). The Superior Court held otherwise, and the Blounts now argue that the statutory definition itself is unconstitutionally vague. Even before the Rules were in place, the *Bangor Baptist* court granted summary judgment against the plaintiffs' vagueness challenge to the statute. 549 F.Supp. at 1232.

The entry is:

Judgment affirmed.

All concurring.