895 A.2d 944 (2006)
2006 ME 39
Julia ANDERSON et al.
v.
TOWN OF DURHAM et al.
Supreme Judicial Court of Maine.
Argued: March 24, 2005.
Reargued: February 14, 2006.
Decided: April 26, 2006.
*947 Jeffrey T. Edwards, Preti Flaherty Beliveau Pachios & Haley, L.L.P., Portland, Richard D. Komer (orally), Clark M. Neily, Institute for Justice, Arlington, VA, for plaintiffs.
G. Steven Rowe, Atty. Gen., Paul Stern, Deputy. Atty. Gen. (orally), William H. Laubenstein III, Asst. Atty. Gen., Sarah Forster, Asst. Atty. Gen., Augusta, Michael E. Saucier (orally), Thompson & Bowie, L.L.P., Jeffrey A. Thaler (orally), Bernstein Shur Sawyer & Nelson, P.A., Zachary Heiden, Maine Civil Liberties Union Foundation, Portland, Peter J. Brann, Brann & Isaacson, Lewiston, Andrew D. Roth, Bredhoff & Kaiser, P.L.L.C., Robert H. Chanin, National Education Association, Washington, DC, for defendants.
Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.[*]
Majority: SAUFLEY, C.J., and DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.
Concurrence: SAUFLEY, C.J., and LEVY, J.
Dissent: CLIFFORD, J.
ALEXANDER, J.
[¶ 1] In this case, we review again whether Maine's tuition payment statute, 20-A M.R.S. § 2951(2) (2005), violates the First and Fourteenth Amendments of the United States Constitution. The statute authorizes the use of public funds to pay tuition at approved private schools on behalf of students who live in districts that do not operate a public high school, provided the school is nonsectarian. We upheld section 2951(2) against a constitutional challenge in Bagley v. Raymond School Department, 1999 ME 60, 728 A.2d 127. The plaintiffs assert that a subsequent decision of the United States Supreme Court, Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), that upheld the constitutionality of an Ohio tuition voucher program, has changed the law and compels a determination that the prohibition on payments for tuition to attend *948 sectarian schools now violates the United States Constitution. More recent federal court decisions and our review of the current state of the law confirm that the choice the Legislature made in enacting section 2951(2) continues to be a valid, constitutional enactment. Accordingly, we affirm the summary judgment entered in the Superior Court (Cumberland County, Crowley, J.) holding that section 2951(2) is constitutional.

I. CONSTITUTIONAL AND STATUTORY PROVISIONS AT ISSUE
[¶ 2] The constitutional requirements at issue in this case are stated in the First Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment to the United States Constitution.[1] The First Amendment states, in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...."
[¶ 3] The statute at issue is 20-A M.R.S. § 2951(2). Title 20-A M.R.S. § 2951 (2005) states in part: "A private school may be approved for the receipt of public funds for tuition purposes only if it: ... (2) ... [i]s a nonsectarian school in accordance with the First Amendment of the United States Constitution."

II. LEGAL HISTORY
[¶ 4] We extensively discussed the history and nature of section 2951(2) in Bagley, 1999 ME 60, ¶¶ 2-5, 728 A.2d at 130-31. Title 20-A authorizes the Department of Education and school districts to provide a public education in a variety of ways. A school district may build its own high school, or it may contract with another school district or private school that meets State school approval criteria for tuition purposes. 20-A M.R.S. § 2701 (2005). Parents in communities that do not have a public high school[2] may elect to send their children to a public high school or an approved private school. Id. Public funds are used to pay to the selected high school a set amount towards tuition costs that is based on an anticipated public high school tuition cost, set pursuant to 20-A M.R.S. §§ 5805, 5806, 5808 (2005). School approval criteria include either accreditation by the New England Association of Colleges and Secondary Schools, or compliance with State requirements including basic instruction in designated curriculum,[3] certification of teachers, length of school day, and student-teacher ratios. 20-A M.R.S. §§ 2901, 2902 (2005).
[¶ 5] Before 1980, Maine's tuition statute permitted payment of public funds to approved sectarian schools for tuition payment purposes. In 1980, in response to an inquiry from a member of the Legislature, Maine's Attorney General issued an opinion stating that using public funds to pay tuition at private, religious schools violated the Establishment Clause. Op. Me. Att'y Gen. 80-2. The Legislature then enacted section 2951(2), which precluded sectarian schools from being approved for receipt of public tuition funds. P.L. 1981, ch. 693, § 5.
[¶ 6] The tuition payment statute imposes a number of obligations on schools that receive public tuition funds. It states:
§ 2951. Approval for tuition purposes

*949 A private school may be approved for the receipt of public funds for tuition purposes only if it:
1. Basic approval. Meets the requirements for basic school approval under subchapter I;
2. Nonsectarian. Is a nonsectarian school in accordance with the First Amendment of the United States Constitution;
3. Incorporated. Is incorporated under the laws of the State of Maine or of the United States;
4. Repealed. Laws 1983, c. 859, § A, 8.
5. Additional requirements. Complies with the reporting and auditing requirements in sections 2952 and 2953 and the requirements adopted pursuant to section 2954;
6. Student assessment. Any school that enrolls 60% or more publicly funded students, as determined by the previous year's October and April average enrollment, shall participate in the statewide assessment program to measure and evaluate the academic achievements of students; and
7. Release of student records. Upon the request of a school unit, release copies of all student records for students transferring from the private school to the school unit.
20-A M.R.S. § 2951 (2005).
[¶ 7] Bagley upheld section 2951(2) in the face of a First and Fourteenth Amendment challenge.[4] At that time, another group of parents brought suit in federal court challenging section 2951(2). The Court of Appeals for the First Circuit determined that section 2951(2) was constitutional in Strout v. Albanese, 178 F.3d 57, 66 (1st Cir.1999).
[¶ 8] In Zelman, the United States Supreme Court upheld the constitutionality of an Ohio tuition voucher program that authorized the use of public funds to pay for a child's education at any approved school selected by the parents, including a religious school, determining that the particular program did not conflict with the Establishment Clause. 536 U.S. at 652-53, 122 S.Ct. 2460.
[¶ 9] After the Supreme Court decided Zelman, a bill to repeal section 2951(2) was introduced in the Maine Legislature. L.D. 182 (121st Legis. 2003). The bill did not pass. Thereafter, the plaintiffs initiated this lawsuit to test the constitutional viability of section 2951(2) after Zelman. As before, a different group of parents brought suit in federal court, challenging section 2951(2) on similar grounds. The federal case culminated in a decision of the Court of Appeals for the First Circuit holding that, even after Zelman, the Constitution does not require the State of Maine to fund tuition at sectarian schools. Eulitt v. State of Me., Dep't of Educ., 386 F.3d 344 (1st Cir.2004). Also, in 2004, the United States Supreme Court, in Locke v. Davey, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004), held that a publicly funded Washington State college scholarship program could, without violating the constitution, prohibit use of the funds for pursuit of a devotional theology degree. Id. at 725, 124 S.Ct. 1307.

III. FACTUAL AND PROCEDURAL HISTORY
[¶ 10] The facts in this case are largely stipulated and are not in dispute. The plaintiffs are parents of high school age children who reside in Minot, Raymond, *950 and Durham.[5] The school administrative units within these towns do not operate a public high school. Minot has contracted with the Town of Poland to provide a secondary education to ninety per cent of Minot's students. A student's family may apply to attend another high school, and approval is given on a case-by-case basis, based on educational program requirements.
[¶ 11] Raymond has contracted with the Town of Windham to take fifty percent of Raymond's high school students beginning in 2003.[6] The City of Westbrook has agreed to enroll as many of Raymond's high school students as Raymond wishes. As of October 1, 2003, twenty-five high school students from Raymond, supported by public funds, attended approved private high schools.
[¶ 12] Durham does not have a contract with any neighboring school district, but most of its high school students attend Brunswick High School. As of April 1, 2004, three high school students from Durham attend approved private high schools with public funds.
[¶ 13] The plaintiffs are parents who have elected to send their children to private religious schools that do not qualify as nonsectarian schools for payment of tuition with public funds. For the 2002-2003 school year, one student attends a pervasively sectarian[7] Seventh Day Adventist school. Courses in the religion are required, and students must attend chapel and religious assemblies. Students at these schools cannot avoid Seventh Day Adventist teachings.
[¶ 14] The remaining students attend St. Dominic's Regional High School in Auburn. St. Dominic's is a private, pervasively sectarian Roman Catholic High School operated under the authority of the Roman Catholic Bishop of Portland. Its admissions policy gives preference to students whose families are registered members of Catholic parishes. Participation in religious classes and the spiritual life of the school is mandatory, and students cannot avoid Catholic teachings. Applicants for teaching positions must mirror "gospel values" and understand the role of the school as a "unique pastoral, educational agency of the church." Some of the parents chose St. Dominic's because of its academic program and what they perceive as a stronger level of discipline; some because of sports opportunities; some because the school promotes their sincerely held beliefs as Catholics.
[¶ 15] None of the parties asserts that their religious beliefs mandate that they send their children to religious schools.
[¶ 16] The parents brought this action against each of the Towns, the Town School Departments, and Town School Superintendents *951 (the Town Defendants), as well as the Maine Department of Education and the Commissioner (the State). They seek (1) a declaratory judgment that section 2951(2) violates the Establishment, Free Exercise, and Equal Protection clauses of the First and Fourteenth Amendments to the United States Constitution; (2) an injunction that would forbid the Town Defendants from enforcing section 2951(2); and (3) reimbursement from the Towns for tuition paid to the religious schools, attorney fees, and costs. The parents seek to hold the Town Defendants liable pursuant to 42 U.S.C.A. § 1983 (West 2003), on the ground that they deprived plaintiffs of their constitutional rights under color of state law.
[¶ 17] The Maine Civil Liberties Union and nine residents of the Town of Raymond have intervened as defendants in support of the continuing validity of section 2951(2).
[¶ 18] The trial court granted in part the Town Defendants' motions to dismiss, on the ground that the complaint failed to state a claim upon which relief may be granted pursuant to 42 U.S.C.A. § 1983. After discovery, the remaining parties filed cross-motions for summary judgment. The parties filed an extensive joint stipulation of facts, as well as separate statements of material facts. The Superior Court entered a summary judgment in favor of the State, holding that section 2951(2) did not violate the Constitution. The parents appeal both the order dismissing the Town Defendants and the summary judgment entered in favor of the State. Because we determine that section 2951(2) does not violate the United States Constitution, we do not reach the issues raised on appeal from the order dismissing the Town Defendants.

IV. GOVERNING PRECEDENTS

A. Standard of Review
[¶ 19] We review trial court rulings on issues of law and statutory interpretation de novo. See Ashe v. Enter. Rent-A-Car, 2003 ME 147, ¶ 7, 838 A.2d 1157, 1159. When reviewing the constitutionality of a statute, we "begin with the basic principle of statutory construction that `this Court is bound to avoid an unconstitutional construction of a statute if a reasonable interpretation of the statute would satisfy constitutional requirements.'" Bagley, 1999 ME 60, ¶ 14, 728 A.2d at 133 (internal citations omitted).
[¶ 20] In our review of the constitutional issues presented in this case, we are aided by our own precedent and by recent opinions of federal courts that inform our decision-making on all major issues presented to us in this appeal. Accordingly, we recount our holding in Bagley, examine the law as it has evolved since we decided Bagley, and analyze the impact of current law on the claims before us.

B. Bagley v. Raymond School Department

[¶ 21] In Bagley, after reviewing First and Fourteenth Amendment jurisprudence involving public funding of religious schools, we determined that section 2951(2) did not violate those constitutional provisions. 1999 ME 60, ¶ 72, 728 A.2d at 147. We stated that the issue was not whether a particular program in which state funds are used to benefit religious schools violates the constitution, but whether a "tuition program that specifically excludes religious schools" does so. Id. ¶ 11, 728 A.2d at 132 (emphasis added). The inquiry is the same in the current challenge to section 2951(2).
[¶ 22] We undertook our analysis in Bagley in three parts, examining separately whether section 2951(2) violates the Free *952 Exercise, Establishment, and Equal Protection Clauses of the United States Constitution.

1. Free Exercise Clause
[¶ 23] The Free Exercise Clause of the First Amendment provides that "Congress shall make no law ... prohibiting the free exercise [of religion] . . . ." U.S. CONST. amend. I.[8] Upon a challenge to government action on Free Exercise grounds, the inquiry is "whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." Bagley, 1999 ME 60, ¶ 16, 728 A.2d at 133 (quoting Hernandez v. Comm'r, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)).
[¶ 24] The party challenging a statute on free exercise grounds must initially demonstrate that: (1) the activity burdened by the regulation is motivated by a sincerely held religious belief; and (2) the challenged regulation restrains the free exercise of that religious belief. Blount v. Dep't of Educ. & Cultural Servs., 551 A.2d 1377, 1379 (Me.1988). If the challenger meets that initial burden, the burden shifts, and the State can prevail only by proving that (1) the challenged regulation is motivated by a compelling state interest, and (2) no less restrictive means can adequately achieve that compelling state interest. Id.
[¶ 25] The parents in Bagley contended that section 2591(2) violates the Free Exercise Clause by burdening their fundamental right to send their children to religious schools. Because it is "not within the judicial ken to question the centrality of particular beliefs," Employment Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 887, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (quoting Hernandez, 490 U.S. at 699, 109 S.Ct. 2136), we assumed arguendo that the parents' desire to send their children to religious schools was motivated by a sincerely held religious belief. 1999 ME 60, ¶ 18, 728 A.2d at 134. We determined, however, that no substantial burden had been placed on activity motivated by religious belief, because a statute that merely operates to make the practice of an individual's religious beliefs more expensive does not violate the Free Exercise Clause. Id. (citing Goodall v. Stafford County Sch. Bd., 60 F.3d 168, 171 (4th Cir.1995)). We further observed that the parents were "no more impaired in their efforts to seek a religious education for their [children] than are parents of children in school districts that provide only a free nonreligious education in public schools." Bagley, 1999 ME 60, ¶ 18, 728 A.2d at 135.

2. Establishment Clause
[¶ 26] The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. I. It prevents a state from enacting laws that have the "purpose" or "effect" of advancing or inhibiting religion, Agostini v. Felton, 521 U.S. 203, 222-23, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), or from creating an excessive entanglement between government and religion,[9]Lemon v. Kurtzman, *953 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). While the Free Exercise Clause addresses the "negative" by prohibiting the government from interfering with religious practice, the Establishment Clause addresses the "affirmative" by prohibiting the government "from sponsoring or establishing a religion."[10]Bagley, 1999 ME 60, ¶ 21, 728 A.2d at 135.
[¶ 27] We determined in Bagley that there is "no support for the proposition that the Establishment Clause prevents a state from refusing to fund religious schools." Id. ¶ 22, 728 A.2d at 135-36. We reasoned:
Distilled to its essence, the Establishment Clause prohibits the government from supporting or advancing religion and from forcing religion, even in subtle ways, on those who choose not to accept it. It has no role in requiring government assistance to make the practice of religion more available or easier. It simply does not speak to governmental actions that fail to support religion.
Id. (footnote omitted). Accordingly, we determined that the prohibition against approving religious schools to receive public tuition funds did not violate the Establishment Clause. Id.

3. Equal Protection Clause
[¶ 28] The Equal Protection Clause of the Fourteenth Amendment forbids any state from denying "to any person within its jurisdiction the equal protection of the laws," U.S. CONST. amend. XIV, § 1, and requires, generally, that persons similarly situated be treated alike. See Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Article 1, section 6-A of the Maine Constitution includes similar requirements.[11]
[¶ 29] If government action that is challenged on equal protection grounds infringes on a fundamental constitutional right, or involves an inherently suspect classification such as race, it is subject to analysis under the strict scrutiny standard. Sch. Admin. Dist. No. 1 v. Comm'r, Dep't of Educ., 659 A.2d 854, 857 (Me.1995). Strict scrutiny requires that the challenged action be narrowly tailored to achieve a compelling governmental interest. See Butler v. Supreme Judicial Court, 611 A.2d 987, 992 (Me.1992). If the government action does not implicate either a fundamental right or a suspect class, "different treatment accorded to similarly situated persons need only be rationally related to a legitimate state interest." Sch. Admin. Dist. No. 1, 659 A.2d at 857. When a statute is reviewed under the rational basis standard, it bears a strong presumption of validity. See id. Under the rational basis standard, the burden is on the party challenging the government action to demonstrate that "there exists no fairly conceivable set of facts that *954 could ground a rational relationship between the challenged classification and the government's legitimate goals." Eulitt, 386 F.3d at 356.
[¶ 30] In Bagley, we did not address which level of scrutiny should be applied in analyzing whether section 2951(2) violated the Equal Protection Clause. Because the State proffered only one justification for the statute  compliance with the Establishment Clause  we determined that the Establishment Clause analysis would define the scope of our Equal Protection inquiry. Bagley, 1999 ME 60, ¶ 32, 728 A.2d at 138. We reasoned as follows:
If the exclusion of religious schools is not required by the Establishment Clause of the First Amendment, it must be struck down because the State offers no other reason for its existence. If the exclusion is required in order to comply with the Establishment Clause, the State will have presented a compelling justification for the disparate treatment of religious schools, and the parents' Equal Protection claim will fail. See Widmar v. Vincent, 454 U.S. 263, 271... (1981) (agreeing that compliance with constitutional obligations "may be characterized as compelling.").
Id. ¶ 33, 728 A.2d at 138.
[¶ 31] Even though the Supreme Court had begun to relax the strict prohibition against channeling public funds, at least indirectly, to religious schools,[12] we concluded that the then-current Establishment Clause jurisprudence required Maine to continue to exclude religious schools from approval for state paid tuition. Id. ¶¶ 60-61, 728 A.2d at 144-45. We therefore upheld section 2951(2) on equal protection grounds. Id.
[¶ 32] Shortly thereafter, the First Circuit, presented with a similar constitutional challenge to section 2951(2), came to substantially the same conclusions that we had reached in Bagley. Strout, 178 F.3d at 66.

C. Zelman v. Simmons-Harris

[¶ 33] In Zelman, a group of Ohio taxpayers filed suit to enjoin an Ohio tuition assistance program that provided public funds for tuition at schools of the parents' choice, including private, religious schools. 536 U.S. at 648, 122 S.Ct. 2460. The program had been enacted in response to a crisis in the Cleveland public schools. Id. at 644, 122 S.Ct. 2460. All of the schools in the district were failing, and the federal district court had placed the entire school district under State control. Id. The State enacted the program "to provide educational choices to families with children who reside in the ... District," where few parents in the district had the means to send their children to private schools. Id. at 643-44, 122 S.Ct. 2460.
[¶ 34] Any private school, religious or nonreligious, was eligible to participate in the program, provided it was located within or adjacent to a covered district and met statewide educational standards. Id. at 645. Participating schools had to agree *955 not to discriminate on the basis of race, religion, or ethnic background, or to "advocate or foster unlawful behavior or teach hatred of any person or group on the basis of race, ethnicity, national origin, or religion." Id. (quotation marks and citation omitted.) Tuition aid was distributed to parents according to financial need. Id. at 646. "Where tuition aid is spent depends solely upon where parents who receive tuition aid choose to enroll their child. If parents choose a private school, checks are made payable to the parents who then endorse the checks over to the chosen school." Id. In the 1999-2000 school year, ninety-six percent of the children who participated in Ohio's tuition assistance program enrolled in religious-affiliated schools. Id. at 647, 122 S.Ct. 2460.
[¶ 35] The Supreme Court determined that the Ohio program did not violate the Establishment Clause. The Court focused not on whether a religious institution benefited from receipt of public funds, but on the fact that the funds were channeled indirectly to that institution as a result of private choice. Id. at 652-53, 122 S.Ct. 2460. The Court reasoned as follows:
[W]here a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause. A program that shares these features permits government aid to reach religious institutions only by way of the deliberate choices of numerous individual recipients. The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits.
Id. at 652, 122 S.Ct. 2460. Thus, after Zelman, public tuition subsidies to students to attend sectarian educational institutions may be permissible under the Establishment Clause if the financial assistance program has a valid secular purpose, provides benefits to a broad spectrum of individuals who can exercise genuine private choice among religious and secular options, is paid through the students' parents, and is neutral toward religion. Id.

D. Locke v. Davey

[¶ 36] In Locke, the Supreme Court again addressed application of the First Amendment to educational funding issues. The Court upheld a Washington State college scholarship program that prohibited the use of scholarship funds for pursuit of a devotional theology degree. 540 U.S. at 725, 124 S.Ct. 1307. The restriction was authorized by Washington's state constitution.[13] In upholding the restriction, the Court reaffirmed that "`there is room for play in the joints'" between the religion clauses. Id. at 718, 124 S.Ct. 1307 (quoting Walz v. Tax Comm'n, 397 U.S. 664, *956 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)). By this, the Court meant that "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." Id. at 719, 124 S.Ct. 1307.
[¶ 37] The Court in Locke indicated that Zelman stands for the proposition that under the Establishment Clause, "the link between government funds and religious training is broken by the independent and private choice of recipients." Id. at 719, 124 S.Ct. 1307. Thus, the Court noted, if Washington State wished, it could, consistent with the Establishment Clause, permit scholarship recipients to pursue a degree in devotional theology. Id. The issue in Locke was whether Washington could deny such funding without violating the Free Exercise Clause. Id. The Court determined that it could. Id. at 725, 124 S.Ct. 1307.
[¶ 38] Because the Court in Locke found no free exercise violation, it subjected the plaintiff's due process claim to rational basis scrutiny. Id. at 720 n. 3, 124 S.Ct. 1307. The Court noted that Washington State has a "historic and substantial" interest in not funding the pursuit of devotional degrees in order to avert the practice of state-sponsored clergy, a hallmark of established religion, which justified the limitation. Id. at 722, 725, 124 S.Ct. 1307. Thus, the Court upheld the scholarship limitation, concluding, "[i]f any room exists between the two Religion Clauses, it must be here." Id. at 725, 124 S.Ct. 1307.

E. Eulitt v. State of Maine Department of Education

[¶ 39] The parents in Eulitt, argued that the State's asserted interest in maintaining the sectarian school exclusion in order to avoid an Establishment Clause violation was no longer valid after Zelman, undermining the First Circuit's decision in Strout. 386 F.3d at 348-49.
[¶ 40] Because it concluded that the Free Exercise Clause "defines the scope of the fundamental right to religion incorporated by the Fourteenth Amendment's equal protection guarantee," id. at 353, the Eulitt court assessed whether section 2951(2) comports with the Free Exercise Clause, and then applied rational basis scrutiny "to any further equal protection inquiry," id. at 354. The court held that section 2951(2) imposes no impermissible burden on religion because it does not prohibit attendance at religious schools or prevent parents from choosing religious education for their children. Id. at 354-55. It reasoned that the guarantee of protection from government encroachment does not translate into an affirmative requirement that public entities fund religious activity simply because they fund the secular equivalent of that activity. Id.
[¶ 41] Finding that section 2951(2) did not violate the parents' free exercise rights, the court stated that "we have no occasion to ponder whether Maine's Establishment Clause defense constitutes a compelling interest that justifies the challenged restriction." Id. at 356. The court applied rational basis scrutiny to the statute, pursuant to which the burden was on the parents as challengers of the statute to demonstrate that "there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals." Id. In Eulitt, the parents conceded that if the rational basis test applied, their equal protection claim failed as a matter of law. Id.
[¶ 42] The Court in Eulitt read Locke broadly, stating that "the decision there recognized that state entities, in choosing how to provide education, may act upon their legitimate concerns about excessive entanglement with religion, even though *957 the Establishment Clause may not require them to do so." Id. at 355.

V. ANALYSIS OF ISSUES

A. Motivation for Adoption of Section 2951(2)
[¶ 43] In the 1970s and early 1980s the trend in United States Supreme Court decision-making on Establishment Clause/Free Exercise issues strongly disfavored use of public funds for direct or indirect payments to religious institutions, including religious schools. See Aguilar, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (holding that Establishment Clause prohibited sending public school teachers into private, religious schools to provide remedial education to disadvantaged children);[14]Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) (holding provision of instructional materials and transportation services to religious schools is not permitted; therapeutic services could be provided to religious school students off-site; funding for secular textbooks, testing, and diagnostic services upheld), overruled in part by Mitchell v. Helms, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000); Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) (striking down in part a Pennsylvania law that provided loans of educational materials to religious schools), overruled in part by Mitchell, 530 U.S. 793, 120 S.Ct. 2530; Comm. for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (invalidating New York tax laws that provided direct money grants to qualifying non-public schools for maintenance and repair of facilities and equipment); Lemon, 403 U.S. 602, 91 S.Ct. 2105 (invalidating programs that provided salary supplements to teachers of secular subjects in religious schools).
[¶ 44] This trend in Federal Court decision-making regarding cash payments that would go directly or indirectly to religious institutions, although relaxed somewhat in the late 1980s and early 1990s,[15] continued to influence United States District Court and Court of Appeals decisions, including the lower court decisions in Zelman.[16]
[¶ 45] Many of the actions that challenged use of public funds for religious purposes included claims for violation of civil rights pursuant to 42 U.S.C.A. § 1983, for injunctive relief, and for attorney fees pursuant to 42 U.S.C.A. § 1988. In 1983 actions, attorney fees could be awarded whether a party prevailed on the § 1983 claim or other grounds. Farrar v. Hobby, 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). Further, state and local governments and officials faced a greater risk of liability and attorney fee awards where it could be demonstrated that they were aware that the challenged government actions were violative of constitutional rights and had failed to take corrective action. Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (holding school officials liable when they knew action taken would cause a deprivation of students' constitutional rights), overruled in part by Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Hutto v. Finney, 437 U.S. 678, 691-92, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (upholding imposition of substantial attorney fee award where prison officials failed to correct Eighth Amendment violations that were the subject of a prior court order).
*958 [¶ 46] Had the tuition subsidy program continued as it existed in 1980, paying public funds for tuition to religious schools, the program faced a high risk of a successful challenge that could have resulted in disruption of the entire tuition subsidy effort and a costly attorney fee award to be paid by Maine taxpayers. Thus, in the legal climate of 1980, the Maine Attorney General gave good advice regarding the propriety of using public funds to pay tuition at religious schools. The Maine Legislature acted prudently and responsibly in taking that advice and enacting section 2951(2).
[¶ 47] The actions of the Attorney General and the Legislature were not motivated by any religious animus and were motivated by a desire to respect and comply with the requirements of the Establishment Clause as then interpreted and applied by the United States Supreme Court.

B. Free Exercise and Limitation of Choice
[¶ 48] The parents assert that the government, when making a range of choices available to a group, may not limit those choices on the basis of religion without violating the Free Exercise Clause. The failure to consider the neutrality problem, they argue, undermines the Free Exercise and Establishment Clause holdings in Bagley.
[¶ 49] A statute that is not neutral but either disfavors religion on its face or has been motivated by animosity against religion is subjected to heightened judicial scrutiny and can be justified only upon a demonstration of a compelling governmental interest in the statute. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531-32, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). A statute that is neutral and of general applicability need not be justified by a compelling governmental interest, even if the law has the incidental effect of burdening a particular religious practice. Smith, 494 U.S. at 879-80, 110 S.Ct. 1595; Goodall, 60 F.3d at 171, cert. denied, 516 U.S. 1046, 116 S.Ct. 706, 133 L.Ed.2d 661.
[¶ 50] In Locke, the Supreme Court rejected the argument that the scholarship restriction was presumptively unconstitutional because it was not neutral with respect to religion, citing City of Hialeah. Locke, 540 U.S. at 720, 124 S.Ct. 1307. In Hialeah, the City had adopted ordinances that made it a crime to slaughter animals for reasons other than food consumption. The Supreme Court determined that, although neutral on their face, the ordinances were unconstitutional because they were aimed at suppressing the practice of ritualistic animal sacrifice among members of the Santeria religion. The Court found overwhelming evidence in the record that animosity against the Santeria religion had motivated the ordinances' passage, and struck them down. Id. at 535, 546, 113 S.Ct. 2217.
[¶ 51] The Court in Locke distinguished the scholarship restriction from the ordinances in Hialeah, finding that although not neutral on its face, the scholarship restriction nevertheless withstood constitutional challenge because
[Washington's program] imposes neither criminal nor civil sanctions on any type of religious service or rite. It does not deny to ministers the right to participate in the political affairs of the community. And it does not require students to choose between their religious beliefs and receiving a government benefit. The State has merely chosen not to fund a distinct category of instruction.
540 U.S. at 720-21, 124 S.Ct. 1307 (citations omitted) (footnote omitted).
[¶ 52] The Eulitt court assessed whether, after Locke, section 2951(2) was unconstitutional on the ground of non-neutrality. *959 The court held that the mere exclusion of sectarian schools as recipients of public funds does not create a presumption of animosity against religion, and found that the record contained no evidence that the statute had been motivated by such animosity. 386 F.3d at 355. Analyzing the factors set forth in Locke and Hialeah, the Eulitt court stated:
Maine's decision not to extend tuition funding to religious schools does not threaten any civil or criminal penalty. By the same token, it does not in any way inhibit political participation. Finally, it does not require residents to forgo religious convictions in order to receive the benefit offered by the statea secular education.
Id.
[¶ 53] In Bagley we suggested that section 2591(2) was not neutral on its face, and we subjected the statute to strict scrutiny. 1999 ME 60, ¶ 16 n. 10, 728 A.2d at 133-34. Because we determined that the statute did not substantially burden a religious practice, however, our analysis ended there. Id. ¶ 20, 728 A.2d at 135. The statements in Bagley regarding strict scrutiny did not have the benefit of the analysis in Locke and Eulitt, which clarified that a statute does not lose its neutrality and become subject to strict scrutiny simply because it precludes state funding of a religious educational choice. Locke, 540 U.S. at 720, 124 S.Ct. 1307; Eulitt, 386 F.3d at 356. Although, with the benefit of the analysis in Locke, it is unnecessary to apply a strict scrutiny analysis, we continue to adhere to the view expressed in Bagley that section 2591(2) does not substantially burden a religious practice.
[¶ 54] A burden upon religion exists when "the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). None of the parties in this case has asserted that attendance at public or secular private schools is proscribed by their faith, or that they are being punished for engaging in conduct mandated by their faith, or that the statute places any pressure on them to modify their beliefs. The statute merely prohibits the State from funding their school choice, and as such, it does not burden or inhibit religion in a constitutionally significant manner.
[¶ 55] The fact that after Zelman the Legislature could hypothetically extend tuition funding to sectarian schools without violating the Establishment Clause does not support a presumption that religious hostility motivates the decision to continue the religious school exclusion. Locke recognizes that states have some leeway to choose not to fund religious education even if a choice to fund religious education indirectly might not violate the Establishment Clause.

C. Equal Protection and Rational Basis Analysis
[¶ 56] After Zelman, state payments for education that reach a religious school indirectly as the result of a free and independent choice of parents would not violate the Establishment Clause. This Court in Bagley and the First Circuit in Strout suggested that if the religious school exclusion were based on an erroneous understanding of the Establishment Clause, the statute could violate Equal Protection. Bagley, 1999 ME 60, ¶ 32, 728 A.2d at 138; Strout, 178 F.3d at 64 n. 12. However, Locke and Eulitt have clarified that when performing the equal protection analysis in religious school funding cases, strict scrutiny applies only to the claim that the parents' fundamental right to the *960 free exercise of religion is implicated; all other claims of religious discrimination are subject to rational basis scrutiny. Locke, 540 U.S. at 720 n. 3, 124 S.Ct. 1307; Eulitt, 386 F.3d at 354. Because we have found no free exercise violation, we apply the rational basis test. That test requires only that a fairly conceivable set of facts establish a legitimate government interest that would support the challenged classification. Id.
[¶ 57] The State proffers several justifications for section 2951(2), including Establishment Clause concerns not necessarily governed by Zelman, such as excessive entanglement between religion and state. Additional legitimate interests that the State offers include concerns about maintaining diversity within the public schools, and avoiding involvement in discrimination in admissions and hiring by religious schools.
[¶ 58] The parents argue that the State is barred from offering additional, hypothetical rationales for the statute because the actual rationale is known, citing Weinberger v. Wiesenfeld, 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). The Court stated in Wiesenfeld that a court "need not in equal protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation." Id. (emphasis added). This is a different proposition from stating that only the precise purposes articulated by members of the Legislature and recorded in the legislative record may be considered. Thus, we are not bound by the justification proffered by the State in support of the statute in Bagley, or offered in support of the legislation in 1981. The justifications for the statute asserted by the State now are not inconsistent with or contradictory to prior stated goals. Avoiding excessive entanglement between religion and state, a component of compliance with the Establishment Clause, was an original justification for the statute, and is asserted by the State in this litigation.
[¶ 59] A court undertaking an excessive entanglement analysis ordinarily does so in the context of reviewing a state program that provides aid to religious institutions. Bagley, 1999 ME 60, ¶ 67 n. 35, 728 A.2d at 146. Because we operate in terms of conceivable justifications, we can evaluate the hypothetical situation in which the State authorizes funding for tuition at sectarian schools. It remains conceivable, even after Zelman, that under some set of facts, funding tuition for sectarian schools would run afoul of the Establishment Clause on excessive entanglement grounds. Furthermore, we cannot be certain that twenty-four years later, any sectarian schools would wish to accept entanglements that might arise from state oversight.[17]
*961 [¶ 60] The record in this case is sparse as to the nature of the courses taught at the religious schools and their religious practices. Because the religious schools are not participating in this case, those issues are not central to our decision-making. However, it is possible to envision that there may be conflicts between state curriculum, record keeping and anti-discrimination requirements and religious teachings and religious practices in some schools. These conflicts could result in significant entanglement of State education officials in religious matters if religious schools were to begin to receive public tuition funds and the State moves to enforce its various compliance requirements on the religious schools. This concern to avoid excessive entanglements provides a rational basis to maintain the funding limitation in section 2951(2). Parental choice of the school does not sever the religion-state connection when payment is made by a public entity to the religious school and that payment subjects a school's educational and religious practices to state regulation.

VI. CONCLUSION
[¶ 61] After Zelman, the State may be permitted to pass a statute authorizing some form of tuition payments to religious schools, but Locke and Eulitt hold that it is not compelled to do so. Section 2951(2) falls within the "play in the joints" between the two religion clauses. Section 2951(2) neither improperly infringes on the free exercise of religion, nor violates the Establishment Clause. With respect to the parents' claim of religious discrimination based on the Equal Protection Clause, the statute does not infringe upon the fundamental right to free exercise of religion in a constitutionally significant manner. The remaining claims of religious discrimination are subject only to rational basis scrutiny. The State has supplied a reasonably conceivable set of facts that establish a rational relationship between the statute and a legitimate government interest in avoiding excessive entanglements with religion.
The entry is:
Judgment affirmed.
LEVY, J., with whom SAUFLEY, C.J., joins, concurring.
[¶ 62] In addition to the constitutional issues addressed by the Court, this case presents an important question of law concerning municipal liability that remains unaddressed.
[¶ 63] The nine municipal defendants consist of three Maine communitiesDurham, Minot, and Raymondand their school departments and school superintendents. In the early stages of this proceeding, the Superior Court dismissed the action as to eight of the nine defendants[18] because it concluded, in a reasoned decision applying Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny, that they cannot be held liable under 42 U.S.C.A. § 1983 (West 2003) for merely complying with and enforcing Maine's school voucher statute, 20-A M.R.S. § 2951 (2005). Before us, the plaintiffs contend that the Superior Court erred as to the three school departments and their superintendents, asserting that *962 these defendants can be held liable under § 1983 even if Maine's tuition payment law left them "no choice in this matter other than to disobey state law."
[¶ 64] The plaintiffs' assertion that school districts and their superintendents may be found liable for failing to disobey an act of the Legislature presents a question of great public interest, thus qualifying as one of our recognized exceptions to the mootness doctrine. See Ten Voters of City of Biddeford v. City of Biddeford, 2003 ME 59, ¶ 9, 822 A.2d 1196, 1200. Our decision in Bagley v. Raymond School Department, 1999 ME 60, 728 A.2d 127, also demonstrates that this question will escape review and reoccur in the future, therefore qualifying as another recognized exception to the mootness doctrine. Ten Voters of City of Biddeford, 2003 ME 59, ¶ 8, 822 A.2d at 1200. In Bagley, the trial court determined that the Raymond School Department could not be held liable pursuant to § 1983 for enforcing Maine's school voucher statute, but, as here, we limited our appellate review to the constitutional questions presented and did not reach the municipal liability question. 1999 ME 60, ¶ 10, 728 A.2d at 131.
[¶ 65] The purpose of this lawsuit is to test the constitutionality of Maine's tuition payment law, 20-A M.R.S. § 2951, a statute administered by the Maine Department of Education. I would reach the municipal liability issue that it presents because our resolution of that issue will provide guidance as to whether local governments and their officials should be made defendants in, and compelled to incur the expenses arising from, lawsuits that do not implicate their policies or discretionary acts.
CLIFFORD, J., dissenting.
[¶ 66] Title 20-A M.R.S. § 5204(4) (2005) allows parents residing in towns that lack public school systems to choose the schools their children attend by providing for tuition to be paid to public or private schools in other municipalities. Prior to a 1983 amendment to Maine's tuition statute, section 5204(4) was neutral toward religion, and families residing in towns without their own public schools enjoyed a unique opportunity to send their children to private schools, including sectarian schools. The system worked very well, and offered parents broad choices in the education of their children, choices otherwise enjoyed only by families of some economic means.[19]
[¶ 67] The tuition statute's neutrality toward religion ended in the early 1980s, however, when 20-A M.R.S. § 2951(2) (2005) was enacted to limit those private schools approved for the receipt of public tuition funds to "nonsectarian school[s] in accordance with the First Amendment of the United States Constitution." P.L. 1981, ch. 693, § 5. This amendment denied parents the opportunity to send their children to sectarian schools within the program established by section 5204(4). The amendment was enacted following an opinion issued by the Attorney General, and *963 was justified solely because it was thought at that time to be required by the Establishment Clause of the First Amendment to the United States Constitution. The amendment substantially altered a unique program that benefited Maine families.
[¶ 68] In Bagley v. Raymond School Department, the plaintiffs challenged the constitutionality of section 2951(2). 1999 ME 60, ¶ 1, 728 A.2d 127, 130, cert. denied, 528 U.S. 947, 120 S.Ct. 364, 145 L.Ed.2d 285 (1999). In rejecting that challenge, this Court concluded that the statute's explicit discrimination against parents who desire to send their children to private sectarian schools was justified because, as the State contended, the prohibition on the payment of tuition for religious-affiliated schools was compelled by the Establishment Clause of the United States Constitution. Id. ¶ 33, 728 A.2d at 138. This Court stated:
[t]he State offers only one justification for the statutean effort to comply with the Establishment Clause. Accordingly, it makes little difference whether we classify the level of scrutiny as strict or requiring only a rational basis. If the State's justification is based on an erroneous understanding of the Establishment Clause, its justification will not withstand any level of scrutiny.
Id. ¶ 32, 728 A.2d at 137-38.
[¶ 69] Subsequent to this Court's decision in Bagley, however, the United States Supreme Court concluded that tuition payments by a municipality that enable families to send their children to sectarian schools do not violate the Establishment Clause of the United States Constitution as long as the statutory program pursuant to which the payment is made is neutral as to religion, and the choice of the religious school is the free and independent decision of the parents. Zelman v. Simmons-Harris, 536 U.S. 639, 652, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002). Because the language of section 5204(4) is neutral as to religion, and does provide parents with the choice of the school their child will attend, it is abundantly clear from the decision in Zelman that the Establishment Clause does not require the prohibitory language of section 2951(2). See Locke v. Davey, 540 U.S. 712, 719, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) (citing Zelman, 536 U.S. at 652, 122 S.Ct. 2460).
[¶ 70] Relying on Locke, a United States Supreme Court case decided subsequent to Zelman, this Court concludes that, although it is clear that Maine could repeal section 2951(2) and again make section 5204(4) neutral as to religion, as it once was, and could reinstate tuition aid to parents who reside in towns without public schools and who choose to send their children to sectarian schools without violating the Establishment Clause, the elimination of the discriminatory provision of section 2951(2) is not required.
[¶ 71] Because this Court reads Locke as authorizing the explicit discrimination of section 2951(2), it applies a rational basis test to the equal protection claim of the plaintiffs, and accepts the State's argument that there is a rational basis to justify the unequal treatment of parents who desire to send their children to sectarian schools expressed in section 2951. Because, in my view, this Court reads Locke far more broadly than it should, and applies the wrong test to determine whether section 2951(2) violates the Equal Protection Clause, I respectfully dissent.
[¶ 72] The State of Washington maintains a post-secondary scholarship program for academically gifted students. The Supreme Court concluded in Locke that the State of Washington could refuse to provide scholarship funds pursuant to that scholarship program to students who were pursuing training for the ministry without violating the Free Exercise Clause *964 of the United States Constitution. Locke, 540 U.S. at 721, 725, 124 S.Ct. 1307. In doing so, the Supreme Court stated that "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." Id. at 718-19, 124 S.Ct. 1307.
[¶ 73] The decision in Locke upheld the prohibition of scholarship aid in unique circumstances not applicable to the present appeal. The specific scholarship at issue in Locke was for the study of the ministry, referred to by the Supreme Court as "training for religious professions," and as a "distinct category of instruction." Id. at 721, 124 S.Ct. 1307. Not all scholarship aid to sectarian schools was prohibited, and the Court noted that "[t]raining someone to lead a congregation is an essentially religious endeavor. Indeed, majoring in devotional theology is akin to a religious calling as well as an academic pursuit." Id. The Court noted that in the State of Washington, there is a long history of opposition to the use of taxpayer funds to support the ministry and church leaders, and that the only interest at stake was the State's interest in not funding the training of clergy. Id. at 722 & n. 5, 124 S.Ct. 1307. The Supreme Court stated that it could not "conclude that the denial of funding for vocational religious instruction alone is inherently constitutionally suspect ... [and that i]f any room exists between the two Religion Clauses, it must be here." Id. at 725, 124 S.Ct. 1307.
[¶ 74] Contrary to the training for church ministry that was at issue in Locke, for which the provision of scholarship aid the Supreme Court held could be prohibited, section 5204(4) provides tuition aid for primary and secondary education, education that is compulsory for all students in Maine, and in no way constitutes the "training for religious professions" that uniquely limited the Supreme Court's holding in Locke.
[¶ 75] Moreover, in the State of Washington, the prohibition on funding for education for the ministry is grounded in the State's Constitution. Maine has no such constitutional prohibition. Indeed, until the early 1980s and prior to the existence of section 2951(2), which was enacted to comply with the then current understanding of the Establishment Clause of the First Amendment, section 5204 allowed tuition payments to parents who chose to send their children to sectarian schools.[20] Although Locke states that there is some "play in the joints" between what is permitted by the Establishment Clause and what is required by the Free Exercise Clause of the United States Constitution, Locke, 540 U.S. at 718-19, 124 S.Ct. 1307, the overt and broad discrimination in education mandated by section 2951(2) goes far beyond the limited restriction on funding for ministry training sanctioned by the Supreme Court in Locke, and constitutes more "play in the joints" than was recognized as legitimate in Locke. The prohibition on payment of tuition for sectarian secondary schools is not required by the Establishment Clause of the United States Constitution, and Locke should not be read as providing authority for the discriminatory language found in section 2951(2).
[¶ 76] In my view, section 2951(2) results in a denial of equal protection of the law pursuant to the Maine and Federal Constitutions. See U.S. CONST. amend. XIV, § 1; ME. CONST. art. 1, § 6-A. The disparate treatment mandated by section 2951(2) is based on religion, a most fundamental right, and requires that we apply the strict scrutiny standard to determine the legitimacy of the State's action. Bagley, 1999 ME 60, ¶ 27, 728 A.2d at 136-37. Strict *965 scrutiny requires that the challenged action of the State be narrowly tailored to achieve a compelling governmental interest. Id. The compelling governmental interest that justified the enactment of section 2951(2), namely, that it was required to prevent section 5204(4) from violating the Establishment Clause, is no longer operative, and, accordingly, there is no longer any kind of compelling State interest that justifies the unequal treatment mandated by section 2951(2). Section 2951(2) can no longer withstand strict scrutiny analysis.
[¶ 77] Further, even if Locke is read more broadly than its language would seem to allow, and a rational relationship test is applied to the equal protection interests of the parents, there is no legitimate rationale that should be considered by the Court to justify the discrimination manifested in section 2951(2). The enactment of section 2951(2) was based solely on the conclusion that it was necessary to ensure compliance with the Establishment Clause. That was the only reason advanced by the State in Bagley to justify the discrimination in section 2951(2). Bagley, 1999 ME 60, ¶ 56, 728 A.2d at 144. The language of section 5204(4) making reference to the First Amendment remains unchanged. Because section 2951(2) is not required by the Establishment Clause, despite the fact that Bagley made clear the basis for the enactment of section 2951(2) and the issue on which the State relied in seeking to uphold section 2951(2), the State now advances, and the Court accepts, new, after-the-fact reasons to justify the discriminatory language of section 2951(2). Those reasons should be rejected.
[¶ 78] I agree that the State is not required to provide tuition aid to parents who wish to send their children to non-public schools. If it does provide such aid, however, it should not be able to exclude private schools that also happen to have a religious affiliation. In my view, that is blatant discrimination that reflects not a neutrality toward religion, but rather an animus against religion. As was said in Bagley, "[i]f the State's justification [for the disparate treatment] is based on an erroneous understanding of the Establishment Clause, its justification will not withstand any level of scrutiny." Id. ¶ 32, 728 A.2d at 138. The Establishment Clause is the only rationale that the State should be allowed to advance and that should be considered to justify the disparate treatment reflected in section 2951(2), and it does not.
[¶ 79] I would vacate the judgment of the Superior Court.
NOTES
[*] Justice Paul L. Rudman sat at the first oral argument and participated in the initial conference, but retired before this opinion was certified.

Although not available at the second oral argument, Justice Calkins participated in this opinion. See M.R.App. P. 12(a) (stating that a "qualified justice may participate in a decision even though not present at oral argument").
[1] The plaintiff parents in this case assert only federal constitutional claims.
[2] Title 20-A M.R.S. § 2701 (2005) applies to children in any grade. Only high school is at issue in this case.
[3] Pursuant to 20-A M.R.S. § 4722 (2005), secondary school curriculum requirements include English, social studies, mathematics, science (including a laboratory science) and fine arts.
[4] The parents in Bagley also asserted claims under the related provisions of the Maine Constitution. We addressed those claims "with the understanding that the rights guaranteed by the United States Constitution and the Maine Constitution are coextensive." Bagley v. Raymond Sch. Dep't, 1999 ME 60, ¶ 13, 728 A.2d 127, 132.
[5] As this action has been pending for some time, it is likely that the school attendance of some of the individuals who were attending high school when suit was filed has changed. However, there is no question that the issue presented for decision by this action is a question of great public concern and an issue that repeatedly arises for parents of children attending high school in communities that tuition their high school students to other public and private high schools. Thus, this case appropriately proceeds under generally recognized exceptions to the mootness doctrine. See Consumers for Affordable Health Care, Inc. v. Superintendent of Ins., 2002 ME 158, ¶¶ 18-19, 809 A.2d 1233, 1239-40; Me. Civil Liberties Union v. City of S. Portland, 1999 ME 121, ¶ 10, 734 A.2d 191, 195.
[6] The dates referenced in this opinion reflect the most current information available from the Superior Court record.
[7] A school is pervasively sectarian when a "substantial portion of its functions are subsumed in the religious mission." Hunt v. McNair, 413 U.S. 734, 743, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973).
[8] The religion clauses of the First Amendment are applicable to the states. Cantwell v. Conn., 310 U.S. 296, 303-04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Everson v. Bd. of Educ., 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947).
[9] In Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), the Supreme Court described the inquiry into whether a government aid program gave rise to excessive entanglement between the government and religion as part of the inquiry into whether the program had the impermissible primary effect of aiding or inhibiting religion. Id. at 232, 117 S.Ct. 1997. The Court essentially collapsed the three-part purpose-effect-entanglement test, commonly referred to as the "Lemon" test, into a two-part inquiry, examining the excessive entanglement prong in terms of whether the challenged activity has the effect of advancing religion. Id.; see also Bagley, 1999 ME 60, ¶ 46, 728 A.2d at 141.
[10] For example, the United States Supreme Court has held that the Establishment Clause prohibits government action that creates a denominational preference among religions, Larson v. Valente, 456 U.S. 228, 246, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982); Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 714, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (O'Connor, J., concurring), and prohibits the improper delegation of government authority to a religious entity, Grumet, 512 U.S. at 696-97, 114 S.Ct. 2481 (opinion of Souter, J.).
[11] Article I, § 6-A of the Maine Constitution states: "No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of that person's civil rights or be discriminated against in the exercise thereof."
[12] See Agostini, 521 U.S. 203, 117 S.Ct. 1997 (overruling Aguilar v. Felton, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) in which the Court had concluded that Establishment Clause was violated when public school teachers assisted underprivileged children in religious schools); Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) (determining that Establishment Clause not violated when state paid for sign language interpreter for student at religious school); Witters v. Wash. Dep't of Servs. for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (holding grant of aid to a blind college student for ministerial training did not violate Establishment Clause); Mueller v. Allen, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (upholding Minnesota law allowing taxpayers to deduct expenses incurred in providing education to children without regard to whether the school is religious).
[13] State constitutional provisions, such as the one in Locke, that expressly forbid aid to religious schools to different degrees, may continue to present a barrier for state legislatures seeking to expand options for publicly funded education to religious schools. Krista Kafer, School Choice in 2003: An Old Concept Gains New Life, 59 N.Y.U. ANN. SURV. AM. L. 439, 450-51 (2003). Many of these provisions, known as "Blaine Amendments" for the Maine Senator who unsuccessfully championed a similar proposed amendment to the United States Constitution, have their roots in conflicts between supporters of public schools and supporters of religious, often Catholic, schools in the late nineteenth century. See Bagley, 1999 ME 60, ¶ 13 n. 8, 728 A.2d at 132-33. The Maine Constitution does not contain a Blaine Amendment. Id.
[14] The result in Aguilar was changed by Agostini, 521 U.S. 203, 117 S.Ct. 1997, to allow such uses of remedial education personnel.
[15] See n. 12 and opinions cited therein.
[16] Simmons-Harris v. Zelman, 234 F.3d 945, 965 (6th Cir.2000) (Ryan, J., concurring in part, dissenting in part); Simmons-Harris v. Zelman, 72 F.Supp.2d 834, 853 (N.D.Ohio 1999).
[17] In this case, the parents have indicated that they are asserting only their rights, and that they are not attempting to assert rights of religious schools. Thus, no issue exists as to whether the parents have standing to assert alleged discrimination against the schools. In Bagley, because the case presented "an important issue worthy of evaluation," we reconfigured the parents' equal protection claim from one asserting the rights of the schools to the argument "that the parents' lack of opportunity to have the State pay the tuition for their children to attend a private religious school results in their own disparate treatment on the basis of their religion." 1999 ME 60, ¶ 26, 728 A.2d at 136 (emphasis omitted).

In Eulitt v. State of Maine, 386 F.3d 344 (2004), the First Circuit determined that the parents did not have standing to assert the claim that the State must fund private religious education to the extent it would fund private secular education. That claim, the court ruled, must be asserted by the schools. Id. at 352-53. The court found no basis to support third-party standing on that issue. Id. The court did determine that the parents had standing to seek an injunction against enforcement of section 2951(2) and a declaration of the statute's unconstitutionality. Id. at 353. The court therefore proceeded to address the merits of the case.
[18] The Superior Court (Cumberland County, Mills, C.J.) had previously dismissed the claims against the ninth municipal defendant, the Town of Minot.
[19] Persuasive literature exists to indicate that school choice programs not only provide a good education to students, but also that they are cost effective as well. See, e.g., Brad P. Bender, Comment, "Allegiance to Our Children": The School Choice Debate in the Commonwealth of Pennsylvania, 104 DICK. L. REV. 165 (1999); Mark J. Beutler, Public Funding of Sectarian Education: Establishment and Free Exercise Clause Implications, 2 GEO. MASON IND. L. REV. 7 (1993); Scott Fenton, Comment, School Voucher Programs: An Idea Whose Time Has Arrived, 26 CAP. U.L. REV. 645 (1997); Krista Kafer, Article, School Choice in 2003: An Old Concept Gains New Life, 59 N.Y.U. ANN. SURV. AM. L. 439 (2003); James A. Peyser, SYMPOSIUM: Issues in Education Law and PolicySchool Choice: When, Not If, 35 B.C. L. REV. 619 (1994).
[20] See Frank Heller, Lessons from Maine: Education Vouchers for Students Since 1873, CATO INST. BRIEFING PAPERS (Cato Inst.), Sept. 10, 2001.